UNITED STATES of America, Plaintiff,

v.

PABST BREWING COMPANY, Schenley Industries, Inc., the Val Corporation, Defendants.

No. 59–C–215.

United States District Court
E. D. Wisconsin.

Feb. 28, 1969.

---

Bertram M. Long and Francis C. Hoyt, John T. Cusack, Dept. of Justice, Anti-Trust Div., Chicago, Ill., for plaintiff.

Chadwell, Keck, Kayser & Ruggles, Chicago, Ill., John T. Chadwell, Glenn W. McGee, and, David A. Nelson, Ray T. McCann, Milwaukee, Wis., for Pabst Brewing Co.

Leonard J. Emmerglick, Washington, D. C., for Schenley and Val Corp.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

TEHAN, Chief Judge.

The above case having come on for trial by the court, and the court having considered the evidence adduced at the trial and the arguments of counsel and being fully informed, does hereby make and file the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. Defendant Pabst Brewing Company (hereinafter referred to as "Pabst"), is a corporation organized and existing under the laws of Delaware.

2. Defendant, Schenley Industries, Inc. (hereinafter referred to as "Schenley") is a corporation organized and existing under the laws of Delaware. Prior to July 30, 1958, Schenley wholly owned a subsidiary known as Blatz Brewing Company (hereinafter referred to as "Blatz"). Subsequent to July 30, 1958, the name of this subsidiary was changed to Val Corporation.

3. On or about July 30, 1958, Pabst acquired the assets and business of Blatz from Schenley for $11,000,000 in cash (plus adjustments for Blatz profits from May 31 to July 31, 1958), $3,500,000 in debentures, 200,000 shares of its common stock and common stock purchase warrants for an additional 350,000 shares of such stock. Thereafter, Pabst Sales Company, a wholly-owned subsidiary of Pabst, amended its corporate charter, changed its name to Blatz Brewing Company, and on February 27, 1959 was merged into Pabst.

4. The complaint was filed by plaintiff, the United States of America, October 1, 1959 and alleged that the effect of the acquisition may be substantially to lessen competition or to tend to create a monopoly in the production and sale of beer in three areas, the United States, the State of Wisconsin, and the three-state area of Wisconsin, Illinois and Michigan, in violation of Section 7 of the Clayton Act. The court was asked to adjudge the acquisition illegal and order Pabst to divest the business and assets of Blatz.

5. An intensive pretrial program produced considerable agreement among the parties. Prior to the time of trial, it

was agreed that the only line of commerce involved is the beer industry, i. e., the production, distribution and sale of beer. Jurisdiction and venue were admitted by Pabst, as was the fact that both Pabst and Blatz sold beer in interstate commerce prior to the acquisition and Pabst continued to do so thereafter. The parties had also agreed that the continental United States as a whole was a relevant section of the country.

6. Several issues remained, however. Pabst denied that the State of Wisconsin or the three-state area of Illinois, Wisconsin and Michigan was a relevant section of the country as that term is used in Section 7 of the Clayton Act. Issue was likewise joined as to whether the acquisition might substantially lessen competition or tend to monopoly in any of the alleged sections of the country. Pabst denied all plaintiff's allegations as to probable anticompetitive effects of the acquisition in any of the areas advanced by the plaintiff as relevant, alleging rather "that in the exercise of their honest and informed judgment the Board of Directors and management * * * determined that the acquisition of Blatz was the only available solution for the very serious financial predicament of Pabst" and that the acquisition's purpose was to avoid the serious consequences of Pabst's declining sales and increasing losses [1] and that its effect was to preserve and promote competition in the beer industry.

7. Plaintiff thus had the burden of proving its allegations that Wisconsin and the three-state area of Wisconsin, Illinois and Michigan each is a section of the country within which the probable effects of the acquisition are to be examined; and that, within the continental United States, and, if it sustained its burden of proving Wisconsin or the three-state area a relevant geographic market, within one or both of these areas, the probable effect of the acquisition may be substantially to lessen competition or to tend to create a monopoly in the beer industry. Pabst had the burden of proving its failing firm defense.

8. Trial was commenced on January 27, 1964 and the court dismissed the case on Pabst's motion at the conclusion of the Government's case (233 F.Supp. 475 (E.D.Wis.1964)).

9. The Supreme Court reversed this court's dismissal of the action. (United States v. Pabst Brewing Co., 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966)). Upon return of the mandate the trial was completed, and the parties rested on June 28, 1967. Post-trial briefs and proposed findings of fact and conclusions of law were filed as of January 2, 1968, and oral argument was heard on October 1, 1968.

10. When it acquired Blatz in 1958, Pabst already owned and operated four breweries, one, the largest, in Milwaukee, Wisconsin, one in Peoria Heights, Illinois, one in Newark, New Jersey, and one in Los Angeles, California, at which breweries several Pabst brand products were brewed. Blatz operated only one brewery, in Milwaukee, Wisconsin, and that brewery was placed on a shutdown status in 1959, its production thereafter taking place at the four Pabst breweries. Prior to the acquisition, Pabst made sales throughout the continental United States and Blatz sold in thirty-eight states and the District of Columbia. Since the acquisition, Pabst and Blatz brands have been sold nationwide.

11. In 1957, the last full year prior to the acquisition of Blatz by Pabst, Pabst ranked tenth in beer sales in the United States with 3.02% of the market, and Blatz ranked eighteenth with 1.47% of the market, a combined total of 4.49%. In Wisconsin, Pabst ranked fourth with 11.14% of the market and Blatz ranked first with 12.81% of the market. In the three-state area, Pabst ranked seventh with 5.48% of the market and Blatz ranked sixth with 5.84% of the market.

---

[1] Plaintiff's motion to strike this failing firm defense contending that the defense was available only to an acquired firm was denied by this court's order of March 31, 1961.

12.  Since the repeal of prohibition in 1933, the number of breweries operating in the United States had declined from a peak of 750 in 1935 to 229 in 1961 and there appears to be virtually no chance of new entrants into the beer industry. This decline occurred while taxpaid withdrawals, production and consumption of beer were approximately doubled. From 1957 through 1961, the top ten breweries' share of United States sales grew from 45.06% to 52.60% and the top twenty-five breweries' share grew from 68.99% to 76.96%. No brewer had as high as 10% of sales and the number with over 5% was three in 1957, 1958 and 1959, four in 1960 and six in 1961. Membership in the top ten did not remain constant. By 1961, Pabst and Blatz together ranked third in United States sales with 5.83% of the market.

13.  Pabst has offered uncontroverted evidence, drawing from the history and present day realities of the brewing industry, showing plausible reasons for the decline in the number of breweries related solely to economic changes in and external changes affecting that industry, such as (1) changing transportation conditions, coupled with changes in methods of packaging beer, permitting shipment to markets located at greater distances from the breweries,[2] (2) inability of many eager but unprepared entrants into the industry after repeal of prohibition to compete, due to lack of knowledge of the industry and undercapitalization,[3] and, (3) necessity for expenditure of large sums of money for modern equipment required to compete effectively and to lower unit costs.[4] We believe that such explanations of the trend toward concentration, though established in the record, must be held to be immaterial by reason of the Supreme Court's opinion in this case, in which the court stated: (Pp. 552–553, 86 S.Ct. 1665, 1669)

"We have not overlooked Pabst's contention that we should not consider the steady trend toward concentration in the beer industry because the Government has not shown that the trend is due to mergers. There is no duty on the Government to make such proof. It would seem fantastic to assume that part of the concentration in the beer industry has not been due to mergers but even if the Government made no such proof, it would not aid Pabst. Congress, in passing § 7 and in amending it with the Celler-Kefauver Anti-Merger amendment, was concerned with arresting concentration in the American economy, whatever its cause, in its incipiency. To put a halt to what it considered to be a 'rising tide' of concentration in American business, Congress, with full power to do so, decided 'to clamp down with vigor on mergers.' United States v. Von's Grocery Co., *ante*, at 276 [384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555]. It passed and amended § 7 on the premise that mergers do tend to accelerate concentration in an industry. Many believe that this assumption of

2.  Prior to prohibition, the beer industry consisted of a large number of breweries each serving a very small area and selling primarily draft beer. Following repeal, improved road conditions plus modern trucking increased marketing range and changes in packaging to tin cans facilitated shipment. Small local breweries were then faced with outside competition which some were unable to withstand.

3.  At the time of repeal, only 177 breweries were ready to produce beer but by 1935 750 breweries were in operation. Most of the new entrants were local operators and not qualified due to lack of a good product, competent and experienced management, proper financing or proper equipment.

4.  After World War II most local breweries had become regional and those wanting to survive had to obtain automated equipment to produce beer cheaper. Competition was intensified. Costs rose, especially labor and advertising costs, without proportionate raises in production or price, and profitability declined. Those breweries which were unable or unwilling to automate and which could not utilize their facilities to close to capacity were incapable of competing and went out of business.

Congress is wrong, and that the disappearance of small businesses with a correlative concentration of business in the hands of a few is bound to occur whether mergers are prohibited or not. But it is not for the courts to review the policy decision of Congress that mergers which may substantially lessen competition are forbidden, which in effect the courts would be doing should they now require proof of the congressional premise that mergers are a major cause of concentration. We hold that a trend toward concentration in an industry, whatever its causes, is a highly relevant factor in deciding how substantial the anti-competitive effect of a merger may be."

14. The State of Wisconsin has been a leader in the production of beer since the repeal of prohibition and has ranked either first or second in the years 1957 through 1961. In each of those latter years its percentage of national taxpaid withdrawals was never less than 11.45% and its percentage of total national production was 11.34% or greater. From 1957 through 1961, Wisconsin ranked ninth in national beer consumption with 3.66% to 3.75% thereof. The number of breweries operating in and selling beer in Wisconsin, like those in the nation, has declined.

15. The total number of barrels of beer sold by Pabst and Blatz nationally and in Wisconsin in the years 1957 through 1961 were as follows:

| | PABST | | BLATZ | |
| | National | Wisconsin | National | Wisconsin |
|---|---|---|---|---|
| 1957 | 2,548,452 | 340,378 | 1,239,334 | 388,678 |
| 1958 | 2,254,001 | 333,244 | 1,717,489 | 403,437 |
| 1959 | 2,060,775 | 374,764 | 2,133,546 | 416,322 |
| 1960 | 1,952,130 | 429,402 | 2,426,440 | 424,327 |
| 1961 | 2,667,346 | 475,490 | 2,524,716 | 429,772 |

In 1961, Pabst, combined with Blatz, ranked first in sales in Wisconsin, with 27.41% of total beer sales.

16. In the three-state area of Wisconsin, Illinois and Michigan, Pabst ranked seventh in sales in 1957 and 1958, with 5.48% and 4.98% of the market. Blatz ranked sixth in 1957 with 5.48% and fourth in 1958 with 7.70%. The combined percentage after the acquisition ranked Pabst first for each of the years 1959 through 1961 with 13.47%, (1959), 14.25% (1960) and 15.07% (1961) of the market.[5] In 1957, approximately 30.5% of Pabst sales and 66.7% of Blatz sales were in that area being approximately 42% of the combined sales of the two companies. In 1961, the combined sales of Pabst and Blatz in that area remained approximately 42% of their total sales.

17. Neither Wisconsin nor the three-state area rely for sales on breweries located within their boundaries. Both areas imported substantial amounts of the beer consumed there. Both also exported substantial amounts of the beer produced there, shipping beer to every state in the United States. Leading sellers in both areas compete throughout the United States and their relative positions in Wisconsin and the three-state area do not remain stable. A vast amount of beer is regularly shipped between states in all directions.

18. The plaintiff contends that Wisconsin and the three-state area are relevant market areas because small brewing companies find competition difficult more than 200 to 400 miles from their brewing plants, due primarily to freight costs and advertising costs. Such a geo-

5. Pabst brand sales in Michigan alone from 1957 through 1961 were not impressive.

graphic limitation would not establish either Wisconsin or the three-state area as a boundary of the market area of breweries located therein.

19. It has not been demonstrated that entry of new competition into Wisconsin has been impeded by any law of that state regulating the beer industry.

20. Breweries not now competing in Wisconsin or the three-state area are free to enter. However, any brewery attempting to expand its sales operations into those areas will experience certain difficulties. It will have to familiarize Wisconsin or three-state area consumers with its product by spending money on advertising and promotion, will have to overcome established consumer preferences and will have to set up a distribution network. To this extent, it can be said that Wisconsin and the three-state area, like any area, present barriers to new entrants into competition.

21. Wisconsin is not geographically isolated, as claimed by the plaintiff,[6] so as to separate it as a market area.

22. Because of the position of Pabst and Blatz in Wisconsin and the three-state area and the extent of their sales made therein, those areas must be considered relevant market areas within which the competitive effects of the acquisition must be judged.

23. The probable effect of the acquisition of Blatz by Pabst, occurring as it did in an industry experiencing a trend toward concentration and considering the market position and shares of sales of the acquired and acquiring companies, may be substantially to lessen competition or to tend to create a monopoly in the production, distribution and sale of beer in the continental United States, the State of Wisconsin and the three-state area of Wisconsin, Illinois and Michigan.

24. Four months prior to the merger at issue here, the President and Chairman of the Board of Pabst assured the company's stockholders of his confidence in the company's earning power, and concurrently, the officers and directors of Pabst (in their Annual Report for 1957) appeared optimistic about the company's future. This optimism notwithstanding, Pabst ended the year 1957 in a somewhat uncertain condition. At the end of 1957, stockholders' equity stood at $65,337,836 which consisted primarily of fixed assets; funded debt had been reduced by $1,000,000; and the ratio of current assets ($26,314,081) to all current liabilities ($7,503,773) stood at 3.6 to 1. Between the end of 1956 and the end of 1957, current assets of Pabst decreased by $4,025,860. Between the end of 1957 and June 30, 1958, one month prior to the merger, current assets increased slightly, by $496,562, from $26,314,081 to $26,810,643. At the end of 1957, the company had cash assets of $6,360,918, marketable securities of $1,693,623 ("quick" assets) and accounts receivable totalling $5,995,664 (among other current assets). The quick assets were readily liquifiable but the accounts receivable were not only less liquifiable, but unpledgeable as well. Between the end of 1957 and June 30, 1958, cash on hand available to the company increased by $703,562, from $6,360,918 to $7,064,480. Pabst maintained a generally stable net worth position throughout the relevant period of purported financial hardship. In 1957, its net worth was $65,337,836; in 1958, $63,718,011; in 1959, $67,972,225; and in 1960, $70,045,284.

25. Sales of beer accounted for over 85% of all Pabst sales during the period between 1952 and 1958. In that period, total domestic sales of beer by Pabst declined sharply from 4,076,816 to 2,254,001 barrels, and they increased slightly between 1958 and 1961, to 2,667,346 barrels. The average yearly dollar decline

6. Plaintiff contends that Lake Michigan isolates Wisconsin on the east and the upper peninsula of Michigan isolates it on the north, a contention which appears inconsistent with the claim that the State of Michigan should be joined with Wisconsin and Illinois as part of the three-state area, and which is belied by the large amount of Wisconsin brewed beer shipped to Michigan.

in net sales was 15.7% during the critical period, and 12.7% during 1957 alone. Total industry-wide sales within the brewing industry (as measured by tax withdrawals by the states), on the other hand, remained very healthy during the period prior to the merger, decreasing only minimally from 84,733,856 to 84,-288,580 barrels, between 1952 and 1957 and increasing to 88,976,417 barrels by 1961. The relative decline in total domestic sales of beer experienced by Pabst as between 1952 and 1958 (45%) exceeded the relative decline in its selling and administrative expenses (5.6%) as between the same years.

26. In 1957, Pabst ranked tenth in the brewing industry in terms of total barrelage but in 1958, the year of the merger, it had slipped to eleventh place. It was not until 1961, three years after Pabst acquired Blatz, that Pabst's declining market share and declining sales volume was arrested. At the same time that Pabst sales were decreasing, the sales of its major competitors were holding relatively constant or were increasing.

27. A downward trend in sales usually has an accelerating effect as a company loses its product image and consumer demand, and for Pabst, the trend was .alarming but not proved to be irreversible.

28. Net income after taxes of Pabst declined sharply from $7,749,890 in 1952 to (-$2,871,200) in 1957. In its first year of lost income (1956), Pabst suffered a loss of $767,724. It suffered a significant $1,619,825 loss of net income after taxes in the six months ending June 30, 1958. Pabst's witnesses testified that a continuing and alarming decline in profits was projected by the firm. This trend in income was alarming but not proved to be irreversible.

29. Pabst's liabilities for 1957 included, in addition to stockholders' equity, the following:

(a) Accounts payable, accrued wages, commissions and other expenses— $4,270,647;

(b) Other current liabilities—$3,233,-126;

(c) Funded Debt—$7,350,000.

At no time during the critical period prior to the Blatz acquisition did Pabst fail to pay its debts as they became due, nor did it lack sufficiently liquid funds to meet its various obligations as they arose. Pabst enjoyed a sound credit rating, and a good reputation within the trade and among its creditors for solvency and financial stability at all times during the critical period prior to the Blatz acquisition. It had experienced no difficulty in receiving open-account loans during the critical period prior to the Blatz acquisition, and was considered a prime credit risk by Dun and Bradstreet and creditors within the trade. As of June 30, 1958, one month prior to the merger, Pabst was solvent within the technical meaning of that term as recognized by the accounting profession. Pabst incurred a new debt on or about July 30, 1958 when it borrowed $19,000,000 from two sources specifically earmarked for purposes of financing the merger at issue. The record contains no documents contemporaneous with the approximate period during which Pabst apparently contemplated and concluded the acquisition at issue which would suggest that it anticipated either the imminence of insolvency or the real possibility that liquidation of its operations would be necessary in the near future. Live testimony as well as exhibits in the form of projected trends depicting Pabst's financial condition at the time of the merger indicate it might have experienced serious difficulty obtaining future loans. But there is nothing conclusive in the record to show that it would have been fruitless for Pabst to seek another substantial bank loan, even for capital expansion in order to shore up its financial status as an alternative remedy to the merger at issue. If Pabst had undertaken no additional cost-saving or other rehabilitative measures after July 1958, and had been able to borrow no additional working capital, it appears reasonable that the firm would have been in such a pre-

carious position as to possess an insufficiency of working capital for its continued operation as early as 1960.

30. The Pabst Brewing Company paid dividends, $0.10 and $0.625 per share, of $411,238 for the year of 1957.

31. The over-all competitive condition of Pabst at the time of the Blatz acquisition was bleak, as the following findings indicate:

(a) The brand image had deteriorated seriously.

(b) Not only was morale low among company personnel, but the distributor organization was collapsing, as competitors of Pabst strengthened their hold on available distributorships and as Pabst continued therefore to lose consumer customers.

(c) The condition of Pabst plants and equipment was deplorable; these were no longer very competitive from either a personnel, cost or labor relations point of view. By mid-1958 the Pabst plants were becoming so inefficient because of a lack of funds for capital improvement as to lose their ability to compete effectively with the productive facilities of other brewers; nor was Pabst undertaking necessary preventive maintenance work. Pabst's failure to maintain or improve its facilities and equipment is reflected in the following table, which shows that in the critical period prior to the merger, the percentage of provisions for depreciation which were spent by Pabst for property additions had declined sharply to a yearly average of about 50%:

## PABST BREWING COMPANY

Gross Property Additions and Provision for Depreciation
1952 – 1958

| Year | Gross Property [1] Additions | Provisions for [1] Depreciation | Gross Property Additions as Percentage of Provision for Depreciation |
|---|---|---|---|
| 1952 | $3,920,786 | $3,010,818 | 130.22% |
| 1953 | 8,857,444 | 3,154,520 | 280.79% |
| 1954 | 4,776,148 | 3,388,081 | 140.97% |
| 1955 | 1,610,497 | 3,539,855 | 45.50% |
| 1956 | 2,099,474 | 3,521,696 | 59.62% |
| 1957 | 1,954,684 | 3,571,571 | 54.73% |
| 1958 | 1,154,128 | 3,595,203 | 32.10% |

1. Excludes containers.

32. A study of nine leading breweries shows that in the year 1957, Pabst spent substantially more money per barrel on advertising than did any of the other eight. The expensive and centralized approach employed by Pabst in using available advertising media contrasted sharply with less expensive, localized, focused media concepts employed by competing breweries during the critical period of Pabst's decline in sales. It is reasonable to infer that Pabst's advertising program during this period was relatively inefficient and could have been improved with reduced costs to the company.

33. Pabst had the burden of proving that it had made every reasonable effort to explore alternative management and merger possibilities, either as a prospectively acquiring firm or as a firm to be acquired. Pabst has demonstrated that it undertook some limited contacts with a number of firms, but the proof in this respect falls short of a sufficiently clear showing that Pabst management undertook a well-conceived and thorough canvass of the industry such as to ferret out viable alternative partners for merger. Thus, Pabst did not show that the capital transfer resulting in its Blatz acquisition was the only available and reasonable one.

34. In regard to alternative measures recognized by Pabst shortly before the merger, the 1957 Pabst Annual Report itself summarized the firm's "Outlook" as follows:

"* * * our streamlined and experienced sales-marketing teams, fresh from field trips covering a large percentage of our markets, have reported their firm conviction that the necessary job can be done. A healthy determination to meet the challenge which confronts them is evident all along the line.

Important steps which would have been taken to strengthen our public relations programs should also make a significant contribution to our future progress."

35. These indications of possible alternatives notwithstanding, there is nothing conclusive to show either the real existence or non-existence of substantial and viable alternatives to the Blatz acquisition.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and the subject matter of this action.

2. The only line of commerce for purposes of this case is the beer industry, that is, the production, distribution and sale of beer.

3. The continental United States, the State of Wisconsin and the three-state area of Wisconsin, Illinois and Michigan are relevant sections of the country within which the competitive effects of the acquisition of Blatz by Pabst must be judged.

4. The effect of the acquisition of Blatz by Pabst may be substantially to lessen competition or to tend to create a monopoly in the production, distribution and sale of beer in the continental United States, the State of Wisconsin and the three-state area of Wisconsin, Illinois and Michigan.

5. The defendants bear the burden of proving each material element of the failing company defense.

6. In establishing a failing firm defense, the defendants must show that at the time of the merger at issue, the acquiring firm was a corporation with resources so depleted and the prospect of rehabilitation so remote that it faced the grave probability of a business failure. International Shoe Co. v. Federal Trade Commission, 280 U.S. 291, 50 S. Ct. 89, 74 L.Ed. 431 (1930). See also legislative recognition thereof in the revision of the Clayton Act (H.Rep. 1191, 81st Cong., 1st Sess. 6 (1949); S.Rep. 1775, 81st Cong., 2d Sess. 7 (1950).

7. In view of this test the defendants must establish two material elements to their defense: that at the time of the merger, the firm was indeed "failing" in the sense that the firm was heading inevitably in the direction of bankruptcy, with the grave probability that failure would ensue—that is, that the trend was irreversible; and that in respect of the merger, there were available no reasonable, possible, or feasible alternatives which would have permitted the acquiring firm to remain an independent, competitive factor within the brewing industry.

8. On the basis of the record in this case it appears that the defendants were in a very serious, even precarious, financial position at the time of the merger. Nonetheless, they have failed to satisfy their burden of proving the material elements of the failing firm defense. This defense, on the facts in this case, is hereby rejected.