**1400**

UNITED STATES of America,
Plaintiff,

v.

PABST BREWING COMPANY, Schenley
Industries, Inc., the Val Corporation,
Defendants.

No. 59–C–215.

United States District Court
E. D. Wisconsin.

Aug. 6, 1969.

Bertram Long and Francis C. Hoyt,
Dept. of Justice, Anti-Trust Division,
Chicago, Ill., David Cannon, U. S. Atty.,
Milwaukee, Wis., for plaintiff.

Glenn McGee, Snyder, Chadwell, Keck,
Kayser & Ruggles, Chicago, Ill., Ray T.
McCann, Milwaukee, Wis., for Pabst
Brewing Co.

Ralph Hoyt, Milwaukee, Wis., Leonard
J. Emmerglick, Washington, D. C., for
Schenley and Val Corp.

## OPINION

TEHAN, Chief Judge.

On February 27, 1969, findings of fact and conclusions of law were entered in this case holding that the acquisition of Blatz by Pabst in 1958 was a violation of § 7 of the Clayton Act. D.C., 296 F.Supp. 994. The problem of providing a remedy for that violation remained. Very relevant to that problem was the fact that after the acquisition, but before the commencement of this suit in 1959, Pabst had closed the Blatz plant and it is in no condition now to brew beer. Undisputed evidence has established that before beer could be brewed competitively in the Blatz plant, alterations and additions costing close to twenty million dollars would have to be made and a time period of eighteen months to two years would elapse before completion of the work.

When the findings and conclusions were entered, the court scheduled a conference on the question of relief, which was held on March 25, 1969. Thereafter, a series of conferences were held, some noticed by the court and some at the request of the parties. During the conferences it became increasingly apparent that prompt action was essential if we were not to have here a situation like that in other anti-trust cases involving the brewing industry where the Government's success under § 7 appears to have resulted not in a restoration of competition but in substantial dissipation of the brands to be restored. It is undisputed that the Blatz brands have been losing ground, due, to a great extent, to the uncertain climate created as a result of this litigation and this

court's decision, and that if Blatz is kept indefinitely in a state of limbo the effect, particularly on distributors, may be irreparable. Normal problems of divestiture were complicated by the June strike of production workers similar to that which, in 1953, affected Milwaukee breweries so severely and adversely that recovery took years.

In April, during the conference stage, the Government suggested three alternative plans for divestiture. First, it suggested sale by Pabst, to a single buyer, of the entire Blatz operation— brands and obsolete brewing facilities. No purchaser under the plan was suggested, nor did one appear prior to the hearing, with the exception of one brewer which, after contemplating such a purchase, abandoned the plan as unfeasible. Second, it suggested sale by Pabst of the Blatz brands and one Pabst plant. No interested purchaser has ever appeared with a desire to proceed under that alternative. Third, it suggested sale of the Blatz brands alone.

Early in April of 1969, both Pabst and the Government were approached by Associated regarding the purchase by Associated of the Blatz brands and related assets. Negotiations by Pabst and Associated, during which the Government was furnished with all the information it desired, resulted in an agreement for sale of the brands and related assets for $11,500,000, which the Government, though expressing no objection, would not approve. In May, an offer was made by Heileman, and in June an offer, contingent and unrealistic, was made by Grain Belt. All offers finally contemplated only purchase under the Government's third alternative.

A hearing was scheduled by the court for July 8th. However, due to the emergency nature of the situation, including not only the still declining Blatz sales but the tight money market and the production strike, the date was advanced to June 26th. Prior to the hearing, the Government stated its "position" on the then pending offers or-

ally, saying it neither approved nor disapproved of any of them, and preferred its first or second alternatives. In its written statement of position it compared the Heileman and Associated offers, thinking that Grain Belt had withdrawn, concluded that each would have a similar impact, not sufficient to inspire objection, on competition, and stated:

"We are still of the opinion that the Court should order Pabst to find a purchaser who will buy both the Milwaukee brewery and the brand names and that it be directed to do so within a reasonable time."

However, it went on to state that complete divestiture to more than a single purchaser was an acceptable solution.

Pabst also stated its position prior to the hearing by moving for entry of judgment on the Associated offer.

The hearing began as scheduled on June 26th with the three offers to be considered. The court set aside three days for the hearing after a conference with the parties. The hearing actually lasted eighteen days, and before it was over six offers had been before the court.

During the hearing and on July 9th, Grain Belt withdrew its offer, because its capacity was insufficient to brew Blatz and it was unable to reach an agreement for brewing with other brewers, as it had hoped. Also during the hearing other prospective offerors expressed a belated interest in acquiring part or all of the Blatz operation. All who expressed any interest, formally or informally, were told to submit their offers by July 14th.

Three new offers were filed on July 14th, one from Bankit Industries, which withdrew on July 18th, one from United Black Enterprises, which was not prepared to proceed when its turn came on July 22nd and was denied a thirty day extension, and one from Stroh, acting in concert with a returning Grain Belt. Both the Bankit and United Black Enterprises offers were under the Govern-

ment's first alternative. On July 25th, the last day of the hearing, the Associated offer was withdrawn, and Pabst withdrew its motion for entry of judgment based on that offer and moved for entry of judgment based on the Heileman offer.

The Government's position on the two remaining offers at the end of the evidentiary hearing is that it consents to the Pabst proposal to sell the Blatz brands to Heileman.

The Heileman offer as it existed when the hearing started contemplated acquisition of the Blatz brands and related assets for $8,500,000, half payable on closing, planned for before August 15th but later offered to be extended, and a non-interest bearing note for the other half payable December 1, 1969. Heileman agreed to offer employment to salaried employees, 100 to 150 hourly employees and Milwaukee City delivery employees, and to assume Blatz distributor agreements, outstanding commitments on certain advertising and packaging supplies and various union and pension fund liabilities. The offer provided for brewing by Pabst of 400,000 barrels of Blatz in 1969 and up to 400,000 barrels in 1970 at cost plus 5%. Heileman raised its offer during the hearing to $10,750,000, payable at the time of closing, and stated that it would be willing to pay more than 5% over cost for any beer Pabst had to brew in 1970.

The offer of Stroh, acting for itself and Grain Belt, covered the Blatz brands and related assets. The total price offered was $6,000,000 on the date of closing and Stroh bound itself to spend at least $7,500,000 for marketing support for a three year period. Stroh and Grain Belt stressed the value of such a commitment at the hearing and in briefs. However, it should be noted that our opinion dismissing this case in 1964 reveals that Pabst, in happier days when promotion was not so crucial or expensive, spent over $4,000,000 in 1959, and over $5,000,000 in 1960 for advertising Blatz. Stroh's commitment therefore would hardly seem adequate to support and turn around what it claims now to be a failing brand. Stroh agreed to offer employment to all Blatz employees it could practically employ, to offer its distributor agreement to Blatz distributors and to assume commitments for certain advertising and packaging supplies. The offer provided for brewing by Pabst of up to 350,000 barrels between the date of closing (planned for no later than October 1, 1969) and 120 days thereafter, and up to 350,000 barrels in 1970 at cost plus $1.00 per barrel and was contingent on no appeal being taken from an order adopting its offer, a contingency which was later removed. During the hearing, the offer was modified to eliminate any requirement for Pabst contract brewing after the first 120 days, to offer to accept an assignment of Blatz distributor agreements, and to offer payment for certain kegs.

A copy of the agreement between Stroh and Grain Belt was attached to the Stroh offer as filed. The agreement provided that if the Stroh offer was successful, Grain Belt would pay $2,000,000 to Stroh in exchange for a license to manufacture the Blatz brands in Minnesota, Nebraska and Wisconsin, and would share one-third of Stroh's commitment for market support. The two brewers agreed to set up a marketing corporation through which the $7,500,000 marketing support commitment, and perhaps additional sums, would be expended. Stroh was to own two-thirds of the corporation and Grain Belt one-third, and, after the original commitment was spent, directors were to be elected according to shareholders' voting interests. Assets acquired and liabilities assumed under the offer were to be divided on a two-thirds-one-third basis but Grain Belt was to purchase all Milwaukee delivery assets and assume all liability under Milwaukee delivery union contracts. Licensing of others by Stroh was contemplated, with Grain Belt receiving one-third of any royalties. Payment by one partner to the other

of certain sums on certain production was specified, and the partners agreed to offer Blatz distributors their standard distributorship agreements, each distributor to select one of the two breweries. The agreement, while carving out some manufacturing areas, did not expressly divide sales territories.

Stroh's first interest in this case appears to have been around the weekend of Independence Day. On July 7th its President was told to contact representatives of the Government and Pabst. Thereafter, and after Grain Belt withdrew on July 9th, he contacted Grain Belt, and the agreement upon which Stroh's offer is based was drafted over the weekend for submission on July 14th.

Stroh and Grain Belt are not concerned that their offer is at least $4,750,000 less than that of Heileman and argue that money not used for the purchase can be spent on promoting Blatz and that the court should, in effect, punish Pabst by approving the low offer in order to assure that vigorous promotion. As noted before, however, Stroh's promotion commitment is scarcely impressive. We cannot believe that a commitment so low comes from an offeror with the zeal and enthusiasm necessary to keep Blatz a viable competitor and to repair the damage recently caused to it.

The Stroh-Grain Belt offer was presented with assurances that neither market allocation nor price agreement was contemplated by the parties. It appears to the court, however, that, whatever the intention of the parties in the several days during which the agreement was reached, the agreement, in practice, would probably be unworkable without those questionable evils.

The Stroh-Grain Belt offer is also by far less desirable than Heileman's when an examination of resultant market shares is made. As the Government points out in its brief:

"A divestiture of the Blatz brands to Heileman would result in an 18% market share in the State of Wisconsin, 12% in Ohio, and 11.6% in Indiana. The divestiture of Blatz to Stroh-Grain Belt would result in a market share of 33% in Minnesota, 25.96% in Ohio, 24.4% in Michigan and 17.6% in Indiana. In Ohio, Stroh already is the largest seller of beer with 18% of the market and with the addition of Blatz would have almost three times the sales of the second largest company in that State. In the national market, the addition of the present Blatz volume to Heileman would raise Heileman's national market rank from 18th to 12th. The addition of Stroh's two-thirds portion of the Blatz volume will raise Stroh's national market rank from 14th to 11th, and the addition of its partner Grain Belt's one-third portion of the Blatz volume will raise Grain Belt's national market rank from 22nd to 18th."

The principal argument advanced by Stroh and Grain Belt in support of their offer relates to their alleged superior financial ability to support Blatz. As we have indicated, ability without desire is of doubtful value in convincing the court that Blatz will be a viable competitor in the hands of the Stroh-Grain Belt combination. Furthermore, the court is not at all convinced that Heileman is in a less favorable financial position than Stroh and Grain Belt to market Blatz successfully. Much of the testimony relevant to this point was taken in chambers and we cannot here discuss it in detail. It is sufficient to state that the court, as well as the Government and Pabst, is satisfied as of the present time that Heileman can pay the purchase price offered and compete effectively. We are likewise satisfied that Heileman will have the capacity to brew all Blatz required within a reasonable time, based on Heileman's revision of its offer by increasing, after 1969, the amount to be paid for any contract brewing done by Pabst.

Stroh-Grain Belt have also argued that Heileman's experience with other

acquired brands demonstrates that it cannot successfully market a declining brand. Heileman has not previously acquired a brand of the status of Blatz with such a widespread, favorable brand image. And the decline of Blatz is due not to any inferiority in marketing or product which any new owner would have to correct, but, to a great extent, to uncertainty, which the mere designation of a new owner would substantially alleviate.

Pabst's motion for entry of judgment based on the Heileman offer, consented to by the Government, is granted.