# UNITED STATES *v.* PABST BREWING CO. ET AL.

No. 404. Argued April 27, 1966.—Decided June 13, 1966.

*Edwin M. Zimmerman* argued the cause for the United States. With him on the briefs were *Solicitor General Marshall, Assistant Attorney General Turner, Richard A. Posner, Robert B. Hummel* and *Irwin A. Seibel.*

*John T. Chadwell* argued the cause for appellees. With him on the brief were *Glenn W. McGee, David A. Nelson, Joseph R. Gray* and *Ray T. McCann.*

*Thomas E. O'Neill* filed a brief for the Brewers' Association of America, as *amicus curiae,* urging reversal.

MR. JUSTICE BLACK delivered the opinion of the Court.

In 1958 Pabst Brewing Company, the Nation's tenth largest brewer, acquired the Blatz Brewing Company, the eighteenth largest. In 1959 the Government brought this action charging that the acquisition violated § 7 of the Clayton Act as amended by the Celler-Kefauver Anti-Merger amendment.[1] That section makes it unlawful for one corporation engaged in commerce to acquire the stock or assets of another "where in any line of commerce in *any* section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." (Emphasis supplied.) The Government's complaint charged that "The effect of this

---

[1] 38 Stat. 731, as amended, 64 Stat. 1125, 15 U. S. C. § 18 (1964 ed.).

acquisition may be substantially to lessen competition or to tend to create a monopoly in the production and sale of beer in the United States and in various sections thereof, including the State of Wisconsin and the three state area encompassing Wisconsin, Illinois and Michigan . . . ." [2] At the close of the Government's case, the District Court dismissed the case under Rule 41 (b) of the Fed. Rules Civ. Proc., holding that the Government's proof had not shown that either Wisconsin or the three-state area of Wisconsin, Michigan and Illinois was a "relevant geographic market within which the probable effect of the acquisition of Blatz by Pabst should be tested." The District Court also ruled that the Government had not shown that "the effect of the acquisition . . . may be substantially to lessen competition or to tend to create a monopoly in the beer industry in the continental United States, the only relevant geographic market." 233 F. Supp. 475, 481, 488.

## I.

We first take up the court's dismissal based on its conclusion that the Government failed to prove either Wisconsin or the three-state area constituted "a relevant section of the country within the meaning of Section 7."

---

[2] The complaint charged that the merger violated § 7 of the Clayton Act in the following ways among others:

"(a) Actual and potential competition between Pabst and Blatz in the sale of beer has been eliminated;

"(b) Actual and potential competition generally in the sale of beer may be substantially lessened;

"(c) Blatz has been eliminated as an independent competitive factor in the production and sale of beer;

"(d) The acquisition alleged herein may enhance Pabst's competitive advantage in the production and sale of beer to the detriment of actual and potential competition;

"(e) Industry-wide concentration in the sale of beer will be increased."

Apparently the District Court thought that in order to show a violation of § 7 it was essential for the Government to show a "relevant geographic market" in the same way the corpus delicti must be proved to establish a crime. But when the Government brings an action under § 7 it must, according to the language of the statute, prove no more than that there has been a merger between two corporations engaged in commerce and that the effect of the merger may be substantially to lessen competition or tend to create a monopoly in any line of commerce *"in any section of the country."* (Emphasis supplied.) The language of this section requires merely that the Government prove the merger may have a substantial anticompetitive effect somewhere in the United States—"in *any* section" of the United States. This phrase does not call for the delineation of a "section of the country" by metes and bounds as a surveyor would lay off a plot of ground.[3] The Government may introduce evidence which shows that as a result of a merger competition may be substantially lessened throughout the country, or on the other hand it may prove that competition may be substantially lessened only in one or more sections of the country. In either event a violation of § 7 would be proved. Certainly the failure of the Government to prove by an army of expert witnesses what constitutes a relevant "economic" or "geographic" market is not an adequate ground on which to dismiss a § 7 case. Compare *United States v. Continental Can Co.*, 378 U. S. 441, 458. Congress did not seem to be troubled about the exact spot where competition might be lessened; it simply intended to outlaw mergers which threatened competition in any or all parts of the country. Proof of the section of the country where the anticompetitive effect exists is

---

[3] *Times-Picayune* v. *United States,* 345 U. S. 594, 611; *United States* v. *du Pont & Co.,* 351 U. S. 377, 395; *United States* v. *Philadelphia Nat. Bank,* 374 U. S. 321, 360, n. 37.

entirely subsidiary to the crucial question in this and every § 7 case which is whether a merger may substantially lessen competition anywhere in the United States.

## II.

The Government's evidence, consisting of documents, statistics, official records, depositions, and affidavits by witnesses, related principally to the competitive position of Pabst and Blatz in the beer industry throughout the Nation, in the three-state area of Wisconsin, Illinois, and Michigan, and in the State of Wisconsin. The record in this case, including admissions by Pabst in its formal answer to the Government's complaint, the evidence introduced by the Government, the findings of fact and opinion of the District Judge, shows among others the following facts. In 1958, the year of the merger, Pabst was the tenth largest brewer in the Nation and Blatz ranked eighteenth. The merger made Pabst the Nation's fifth largest brewer with 4.49% of the industry's total sales. By 1961, three years after the merger, Pabst had increased its share of the beer market to 5.83% and had become the third largest brewer in the country. In the State of Wisconsin, before the merger, Blatz was the leading seller of beer and Pabst ranked fourth. The merger made Pabst the largest seller in the State with 23.95% of all the sales made there. By 1961 Pabst's share of the market had increased to 27.41%. This merger took place in an industry marked by a steady trend toward economic concentration. According to the District Court the number of breweries operating in the United States declined from 714 in 1934 to 229 in 1961, and the total number of different competitors selling beer has fallen from 206 in 1957 to 162 in 1961. In Wisconsin the number of companies selling beer has declined from 77 in 1955 to 54 in 1961. At the same time the number

of competitors in the industry were becoming fewer and fewer, the leading brewers were increasing their shares of sales. Between 1957 and 1961 the Nation's 10 leading brewers increased their combined shares of sales from 45.06% to 52.60%. In Wisconsin the four leading sellers accounted for 47.74% of the State's sales in 1957 and by 1961 this share had increased to 58.62%. In the three-state area the evidence showed that in 1957 Blatz was the sixth largest seller with 5.84% of the total sales there and Pabst ranked seventh with 5.48%. As was true in the beer industry throughout the Nation, there was a trend toward concentration in the three-state area. From 1957 to 1961 the number of major brewers selling there dropped from 104 to 86 and during the same period the eight leading sellers increased their combined shares of beer sales from 58.93% to 67.65%.

These facts show a very marked thirty-year decline in the number of brewers and a sharp rise in recent years in the percentage share of the market controlled by the leading brewers. If not stopped, this decline in the number of separate competitors and this rise in the share of the market controlled by the larger beer manufacturers are bound to lead to greater and greater concentration of the beer industry into fewer and fewer hands. The merger of Pabst and Blatz brought together two very large brewers competing against each other in 40 States. In 1957 these two companies had combined sales which accounted for 23.95% of the beer sales in Wisconsin, 11.32% of the sales in the three-state area of Wisconsin, Illinois, and Michigan, and 4.49% of the sales throughout the country. In accord with our prior cases,[4] we

---

[4] See, e. g., United States v. Von's Grocery Co., ante, p. 270; Brown Shoe Co. v. United States, 370 U. S. 294; United States v. Philadelphia Nat. Bank, 374 U. S. 321; United States v. El Paso

**552**

hold that the evidence as to the probable effect of the merger on competition in Wisconsin, in the three-state area, and in the entire country was sufficient to show a violation of § 7 in each and all of these three areas.

We have not overlooked Pabst's contention that we should not consider the steady trend toward concentration in the beer industry because the Government has not shown that the trend is due to mergers. There is no duty on the Government to make such proof. It would seem fantastic to assume that part of the concentration in the beer industry has not been due to mergers but even if the Government made no such proof, it would not aid Pabst. Congress, in passing § 7 and in amending it with the Celler-Kefauver Anti-Merger amendment, was concerned with arresting concentration in the American economy, whatever its cause, in its incipiency. To put a halt to what it considered to be a "rising tide" of concentration in American business, Congress, with full power to do so, decided "to clamp down with vigor on mergers." *United States* v. *Von's Grocery Co., ante,* at 276. It passed and amended § 7 on the premise that mergers do tend to accelerate concentration in an industry. Many believe that this assumption of Congress is wrong, and that the disappearance of small businesses with a correlative concentration of business in the hands of a few is bound to occur whether mergers are prohibited or not. But it is not for the courts to review the policy decision of Congress that mergers which may substantially lessen competition are forbidden, which in effect the courts would be doing should they now require proof of the congressional premise that mergers are a major cause of concentration. We hold that a trend toward

*Gas Co.,* 376 U. S. 651; *United States* v. *Alcoa,* 377 U. S. 271; *United States* v. *Continental Can Co.,* 378 U. S. 441; *FTC* v. *Consolidated Foods,* 380 U. S. 592.

concentration in an industry, whatever its causes, is a highly relevant factor in deciding how substantial the anticompetitive effect of a merger may be.

*Reversed and remanded.*

MR. JUSTICE DOUGLAS, concurring.

While I join the Court's opinion, I add only a word in support of the Court's description of the anatomy of the "relevant geographic market" for purposes of the Clayton Act. The alternative leads to a form of concentration whose ultimate *reductio ad absurdum* is described in the Appendix to this opinion.

## APPENDIX TO CONCURRING OPINION OF MR. JUSTICE DOUGLAS.

Every time you pick up the newspaper you read about one company merging with another company. Of course, we have laws to protect competition in the United States, but one can't help thinking that, if the trend continues, the whole country will soon be merged into one large company.

It is 1978 and by this time every company west of the Mississippi will have merged into one giant corporation known as Samson Securities. Every company east of the Mississippi will have merged under an umbrella corporation known as the Delilah Company.

It is inevitable that one day the chairman of the board of Samson and the president of Delilah would meet and discuss merging their two companies.

"If we could get together," the president of Delilah said, "we would be able to finance your projects and you would be able to finance ours."

"Exactly what I was thinking," the chairman of Samson said.

554

"That's a great idea and it certainly makes everyone's life less complicated."

The men shook on it and then they sought out approval from the Anti-Trust Division of the Justice Department.

At first the head of the Anti-Trust Division indicated that he might have reservations about allowing the only two companies left in the United States to merge.

"Our department," he said, "will take a close look at this proposed merger. It is our job to further competition in private business and industry, and if we allow Samson and Delilah to merge we may be doing the consumer a disservice."

The chairman of Samson protested vigorously that merging with Delilah would not stifle competition, but would help it. "The public will be the true beneficiary of this merger," he said. "The larger we are, the more services we can perform, and the lower prices we can charge."

The president of Delilah backed him up. "In the Communist system the people don't have a choice. They must buy from the state. In our capitalistic society the people can buy from either the Samson Company or the Delilah Company."

"But if you merge," someone pointed out, "there will be only *one* company left in the United States."

"Exactly," said the president of Delilah. "Thank God for the free enterprise system."

The Anti-Trust Division of the Justice Department studied the merger for months. Finally the Attorney General made this ruling. "While we find some drawbacks to only one company being left in the United States, we feel the advantages to the public far outweigh the disadvantages.

"Therefore, we're making an exception in this case and allowing Samson and Delilah to merge.

"I would like to announce that the Samson and Delilah Company is now negotiating at the White House with the President to buy the United States. The Justice Department will naturally study this merger to see if it violates any of our strong anti-trust laws."

ART BUCHWALD, *Washington Post,* June 2, 1966, p. A21.

MR. JUSTICE WHITE, concurring.

I join the Court's opinion insofar as it holds the merger of Pabst and Blatz may substantially lessen competition in the beer industry in the Nation as a whole.

MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART joins, concurring in the result.

I concur in the judgment of reversal on the limited ground that the Government's evidence is sufficient to establish prima facie that Wisconsin and the tri-state area comprising Wisconsin, Michigan and Illinois are both proper sections of the country in which to measure the probable effects of the acquisition of Blatz by Pabst under § 7 of the Clayton Act, 38 Stat. 731, as amended, 64 Stat. 1125, 15 U. S. C. § 18 (1964 ed.). However, I am wholly unable to subscribe to the Court's opinion which appears to emasculate the statutory phrase "in any section of the country."

I.

The Court is quite right in stating that the primary question in a § 7 case is whether the effect of the challenged acquisition "may substantially lessen competition." *Ante,* p. 550. But any resolution of this question necessarily involves a study of statistics and other evidence bearing upon market shares, market trends, number of competitors and the like. Obviously such figures will vary depending upon what geographic area is chosen as relevant, and the possibilities for "gerry-

mandering" are limitless. The Senate Report which discusses the "section of the country" requirement, S. Rep. No. 1775, 81st Cong., 2d Sess., 5–6 (1950), notes that it "will vary with the nature of the product" so as to determine an "economically significant" area in which to measure a change in the level of competition. *Id.,* at 5. "In determining the area of effective competition for a given product," the report continues, "it will be necessary to decide what comprises an appreciable segment of the market. An appreciable segment of the market may not only be a segment which covers an appreciable segment of the trade, but it may also be a segment which is largely segregated from, independent of, or not affected by the trade in that product in other parts of the country." *Id.,* at 6.

The cases under § 7 have established a flexible, but workable, approach to the question of geographic market. In *Brown Shoe Co.* v. *United States,* 370 U. S. 294, the Court recognized that a test for an appropriate geographic market had been prescribed by Congress, 370 U. S., at 336, and that it must " 'correspond to the commercial realities' of the industry and be economically significant." 370 U. S., at 336–337.[1] The determination of relevant geographic market received more detailed study in *United States* v. *Philadelphia Nat. Bank,* 374 U. S. 321. The Court there saw the "proper question" as framed to ascertain "not where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate." 374 U. S., at 357.

The appropriate geographic area in which to examine the effects of an acquisition is an area in which the parties to the merger or acquisition compete, and around

---

[1] See in addition my concurring opinion in *Brown,* 370 U. S., at 368–369.

which there exist economic barriers that significantly impede the entry of new competitors. Of course, as *Philadelphia National Bank* and commentators [2] have noted, no such designation is perfect, for all geographic markets are to some extent interconnected, and over time any barrier may be overcome or may disappear owing to structural or technological changes in the industry, *e. g.,* refrigeration which widened markets for "perishable" foods. Thus, in *Philadelphia National Bank,* it was recognized that large borrowers and depositors operate in something like a national banking market, and that very small borrowers and depositors are likely to confine themselves to banks in their immediate neighborhood. Nevertheless, the Court was able to find a four-county area in metropolitan Philadelphia to be a relevant "section of the country" in which to measure that merger. Some of the criteria cited there as supporting such a determination were the convenience of location for all but the largest bank customers as an important factor limiting competition by outsiders, the concentration of the defendant's business in that region, and administrative designations of that region as an "area of effective competition." 374 U. S., at 359–361. See also *Tampa Elec. Co.* v. *Nashville Coal Co.,* 365 U. S. 320, 327, 330–333.

## II.

In the case before us the Government has in my opinion made a .prima facie showing that the State of Wisconsin and the three-state area [3] are both relevant

---

[2] See, *e. g.,* Bock, Mergers and Markets 35–42 (1960); Kaysen & Turner, Antitrust Policy 101–102 (1959); Martin, Mergers and the Clayton Act 321–322 (1959).

[3] The evidence in the record supporting the Government's contention that the three-state area is a relevant geographic market in which to measure the effects of this acquisition is not significantly different from that supporting the Wisconsin market. For simplicity, this opinion will therefore discuss these criteria only in terms of the Wisconsin market.

sections of the country for measuring the effects of this merger. That is, on the basis of the evidence thus far submitted, I believe the Government has made a sufficient showing that significant barriers exist to prevent outside brewers from entering the Wisconsin market as effective competitors to those brewers already marketing beer there.

As a preliminary matter, it is clear that Pabst and Blatz both carry on substantial business and are direct competitors in Wisconsin. About 13% of Pabst's sales in 1957, the year before the merger, were made in Wisconsin, where Pabst maintained one of its four breweries. Blatz maintained its only brewery in Wisconsin, where it sold 31% of its beer in 1957. It is thus clear that the two beers were important competitors in that area; indeed Blatz was the leading seller in Wisconsin and Pabst the fourth largest. These statistics become meaningful for antitrust purposes in the context of the further evidence showing substantial barriers to brewers who were not then selling beer in Wisconsin.

The sales statistics submitted by the Government show not only a high percentage of the Wisconsin market dominated by Pabst and Blatz, but also a pattern of local concentration in the sale of beer there and throughout the country. Wisconsin, with about the highest per capita beer consumption level in the country, was dominated by substantially the same group of brewers maintaining substantially the same market shares year after year without serious challenge from other brewers operating in other sectors of the country.[4] This picture of local concentration in various regional markets is supported by evidence that brewers are able to sell the same beer in different States for different prices (exclusive of trans-

---

[4] Only one-third of the Nation's beer producers sold beer in the Wisconsin market.

portation cost). Although there is no direct evidence in the record that beer is subject to high transportation costs, which would of course be highly persuasive evidence supporting the local-market theory, it is relevant that about 90% of beer sold in Wisconsin comes from breweries located in that State or nearby in Minnesota. Indeed, in 1959 the Blatz brewery in Wisconsin was closed down, and Blatz beer was brewed in the four Pabst breweries, because "decentralization" was considered more efficient. To the extent that it is true that local breweries have an advantage in terms of efficiency and thus cost, a significant barrier exists to brewers who wish to sell in Wisconsin but brew their beer in other areas of the country. Thus, in terms of the structure of beer marketing as reflected in sales statistics and brewery location the record supports the relevancy of Wisconsin as a distinguishable and economically significant market for the sale of beer.

This picture of beer competition as essentially a localized or regional matter is buttressed by evidence of marketing techniques used by the industry. Beer is not a fungible commodity like wheat; product differentiation is important, and the ordinary consumer is likely to choose a particular brand rather than purchase any beer indiscriminately. The record demonstrates a recognition in the industry that a successful sales program relies to a large extent on consumer recognition and preference for particular brands, and that this preference must be built up through intensive advertising and other promotional techniques. There is evidence in the record regarding efforts by Pabst and Blatz to enter new or undeveloped markets in this way, and the inference is inescapable that were a brewer from, say, Colorado, interested in entering the Wisconsin market, a great deal of costly preliminary promotional activity would be required before sizable Wisconsin sales could be expected.

In addition, the record indicates that beer is sold through distribution networks operating on regional, statewide, and local levels. There are numerous examples in the record of the highly specialized salesmanship needed to induce local retail sellers to carry, display, and advertise new brands of beer.

This heavy emphasis on consumer recognition and promotional techniques in the marketing of beer supports the conclusion that there does exist a substantial barrier to a new competitor in a regional market such as Wisconsin. To enter this market the new entrant must be prepared to incur considerable expense over a substantial period of time creating a distribution network and advertising his brand in order to compete more or less on a parity with an established seller in the Wisconsin market.

A further factor, the pervasive state regulation of the sale and promotion of alcoholic beverages, well documented in the record, supports the acceptability of Wisconsin as a relevant geographic market for beer. Methods of sales promotion permitted in one State are unlawful in others. State regulations govern labeling, size of containers, alcoholic content of beer, shipping procedures, and credit arrangements with wholesalers. A brewer wishing to enter the Wisconsin market does not merely start transporting beer to Milwaukee; he must comply with these various state requirements, which may differ from those in the States in which he has always dealt. Although this factor may not by itself be an effective barrier to distant competitors, it does reinforce the other factors examined in justifying the conclusion that there is a state or regional market for beer.

All of this, taken in the context of a prima facie case, supports the proposition that Wisconsin is an identifiable "section of the country" presenting impediments to the entry of new competitors and insulating those already within the market. In terms of antitrust consequences,

this means that those already within such a local market can engage in oligopolistic pricing or other practices without a very real threat that brewers operating in other areas could easily, and within a reasonably short time, enter the Wisconsin market as effective competitors of those already entrenched there.

It should be emphasized that we are faced here only with a dismissal after the presentation of the Government's case. On remand, the appellees can of course attempt to refute this showing by introducing evidence demonstrating either that these asserted barriers do not in practice exist, or that when seen in light of other factors they are so unimportant that brewers who presently do not sell in the Wisconsin market are not in fact appreciably hindered from entering as effective competitors.

## III.

The trial court also found that viewing the entire continental United States as the relevant market, the evidence submitted did not sustain the Government's contention that the acquisition may substantially lessen competition. I would not disturb that conclusion. I do not of course pass upon the sufficiency of the evidence to establish a prima facie violation of § 7 within Wisconsin or the three-state area, an issue which the District Court had no occasion to reach in view of its determination that neither of these sections was a relevant market.

For these reasons I believe the District Court erred in dismissing the complaint at the close of the Government's case.

MR. JUSTICE FORTAS, concurring in the result.

The District Court clearly erred in dismissing the complaint. There is ample proof that the effect of this acquisition may be substantially to lessen competition in the production and sale of beer in well-defined sections

of the country. But I cannot join the Court's opinion because, contrary to the statements in that opinion, I believe that, in § 7 cases, it is the Government's duty, as plaintiff, to prove the "market" or the "section of the country" in which the claimed effect of the acquisition is manifest. This is an important, even essential, element of the judgment which must be made in a § 7 case. This Court has consistently recognized this. See, *e. g., Brown Shoe Co.* v. *United States,* 370 U. S. 294; *United States* v. *Philadelphia Nat. Bank,* 374 U. S. 321, 355–362. It is true that the search for the relevant market is frequently complicated and elaborated beyond reason or need—sometimes for purposes of delay or obstruction. But the search is nevertheless essential. It is not a snipe hunt.

In some situations, arithmetic as to the merging companies' aggregate volume of sales of the commodity involved may be impressive. Sometimes, the resulting size of the conjoined companies is great. But unless it can be shown that the effect may be "substantially to lessen competition, or to tend to create a monopoly" in a specific section of the country, courts are not authorized to condemn the acquisition. Congress has been specific in at least this respect, and I cannot agree that this standard should be denigrated. Unless both the product and the geographical market are carefully defined, neither analysis nor result in antitrust is likely to be of acceptable quality. Compare majority and dissenting opinions in *United States* v. *Grinnell Corp., post,* p. 563 (involving §§ 1 and 2 of the Sherman Act).