**UNITED STATES of America,**
**Plaintiff,**

**v.**

**G. HEILEMAN BREWING CO., Inc., and**
**Associated Brewing Company,**
**Defendants.**

**Civ. A. No. 38162.**

United States District Court,
E. D. Michigan, S. D.

June 20, 1972.

Allen A. Dobey, Dept. of Justice, Antitrust Div., Washington, D. C., for plaintiff.

Robert G. Cutler, Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., Bernard Mindich, Wachtell, Lipton, Rosen & Katz, New York City, David E. Beckwith, Foley & Lardner, Milwaukee, Wis., for defendants.

## MEMORANDUM AND ORDER

DeMASCIO, District Judge.

Associated Brewing Company (Associated), a Michigan corporation, owns and operates the Jacob Schmidt Brewing Co. in St. Paul, Minnesota. Drewrys Limited U.S.A., Inc. and Sterling Brewery are wholly owned subsidiaries of Associated with breweries in South Bend and Evansville, Indiana. These three breweries have been referred to as the western plants of Associated. The G. Heileman Brewing Co., Inc. (Heileman) owns breweries located in LaCrosse and Sheboygan, Wisconsin, and Newport, Kentucky. Associated and Heileman produce and market beer under a variety of brand names.

Between 1960 and 1970 both Associated and Heileman experienced substantial growth through acquisitions. Associated grew from the twenty-fourth largest brewer in 1960 to the eleventh largest in 1971. In 1962, Associated acquired the E & B Brewing Company; in 1964, Associated acquired the assets of the Sterling Brewery Company. In 1966, Associated merged with Drewrys Limited U. S.A., Inc. Even at that time, the government advised Associated that it was concerned about the effect on competition of the Drewrys acquisition. Simi-

larly, Heileman, the nation's thirty-first largest brewer in 1960, began its growth in 1962 when it acquired Fox Head Brewing Co., of Waukesha, Wisconsin. In 1963, Heileman acquired the trade name of "Braumeister" and one year later it acquired Glueks Brewing Company. During the period 1966–1967, Heileman acquired Duluth Malting Co. and Wiedemann Brewing Co. Finally, in 1967, Heileman acquired the Ortell Brewing Co., and by 1971 had grown to the fifteenth largest brewer in the nation.

On April 9, 1972, Associated entered into an agreement to sell its western brewing plants (Schmidt, Drewrys and Sterling) to Heileman. Upon learning of this contract, the Justice Department instituted this antitrust action under an Act of Congress of October 15, 1914 ch. 323, 38 Stat. 730 (15 U.S.C. § 12 et seq.) as amended, commonly known as the Clayton Act (the Act). The government has alleged that this proposed acquisition by Heileman violates Section 7 of the Act (15 U.S.C. § 18). In addition to seeking a judgment of the court agreeing with this proposition, the government has filed a Motion for Preliminary Injunction pursuant to Section 15 of the Act (15 U.S.C. § 25).

■ Initially, reference is made to the disconcerting trend toward concentration in the brewing industry as a whole. The number of breweries operating in the United States declined from 229 to 154 between 1960 and 1970. The number of different brewing companies declined from 176 to 79 during the same decade, this in spite of the fact that beer sales have increased 38% in the same ten-year period. Moreover, we are not aware of any new entries into the brewing industry in the past decade. In horizontal merger cases, the United States Supreme Court has placed great emphasis on market share statistics and concentration trends. The court has said:

"We hold that a trend toward concentration in an industry, whatever its causes, is a highly relative factor in deciding how substantial the anticompetitive effect of a merger may be." United States v. Pabst Brewing Co., 384 U.S. 546, 552–553, 86 S.Ct. 1665, 1669, 16 L.Ed.2d 765 (1968).[1]

We are well aware that mergers per se are not to be condemned, and that a merger may lessen, increase, or have little or no affect on competition. However, we find that mergers have been a common form of growth for each of these defendants, and recent concentration trends in the beer industry strongly indicate the anticompetitive effect of this proposed merger.

In its Motion for Preliminary Injunction, which is presently before the Court, the government seeks to enjoin and restrain Heileman and Associated from consummating the sale. To prevail on its Motion the government must establish a reasonable likelihood of success on the merits at trial, and that the traditional equitable relief of an injunction is appropriate in this case. The parties have submitted affidavits and briefs in support of their respective positions and the court has conducted extensive hearings.

It is the government's position that a preliminary injunction enjoining the consummation of this acquisition is necessary because it may be unable to obtain complete and effective relief against a Section 7 violation if it ultimately prevails upon the merits and the acquisition has already occurred. The government relies principally upon the affidavit of Mr. Douglas Dobson, an economist, to establish a reasonable probability that at trial it will succeed in proving that this acquisition is violative of the Act.

The government's affidavits and briefs establish that in 1971 Associated sold 79.8% of the barrelage produced in

---

1. See also United States v. Von's Grocery Co., 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966); United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

its three western plants in the States of Minnesota, Michigan, Indiana, Kentucky, Iowa, Wisconsin, Ohio, and Illinois. During the same period, Heileman sold 84.2% of its total barrelage in the same mid-western states. These percentages of their total barrelage in the same market indicate, beyond dispute, that these defendants are substantial competitors. As a matter of fact, in 1971, Heileman's share of the beer market in these eight states was 7.4% and Associated's share was 5.5%. Their combined sales would account for 12.9% of this same eight-state market on the basis of 1971 statistics.[2]

In 1971, Heileman's net sales amounted to $106.8 million or 2.2% of the national market. Associated's sales during the same period amounted to $92.7 million or 1.8% of the national market. The surviving company would become the eighth largest brewer in the United States with 4% of the national market. A chart attached to the government's affidavit sets forth equally prominent market share increases on an individual state basis. For example, last year in Michigan, Associated had a 4.7% share of the market and Heileman had a 5% share of the market. When combined, the surviving company would become the fourth largest beer producer in the state commanding a 9.7% share. The level of concentration of the top four beer producers in Michigan would increase their share of the market from 65.6% to 66.3%. In the State of Kentucky, Associated is the third largest beer producer with a 16.6% share of the Kentucky beer market. Heileman ranks fourth with an 8.2% share. The surviving company would become Kentucky's largest beer seller and command a 24.8% share of the total state beer sales. The level of concentration of the four largest brewers selling in Kentucky would markedly increase from 64.6% to 72.-

5%; an increase of 7.9 percentage points. In Wisconsin, Heileman ranks third with a share of 11.8% and Associated ranks ninth with a share of 1.4%. The surviving company would control 13.2% of the Wisconsin market. It is to be further noted that in Wisconsin the level of concentration of the top four beer producers would increase from 76.7% to 78.1%. Indiana and Illinois are comparable and would result in providing the surviving company with upwards of 10% of each state's market. Moreover, there are corresponding changes in the level of concentration of the top four beer producers in each of the remaining states in the eight-state area.

The foregoing statistics were compiled and presented by the government on the premise that these eight mid-western states, or any one of them, constitute a relevant market area. To counter that position, the defendants offered sophisticated economic testimony to dispute the government's contention that its geographic area of distribution is a relevant market. On this point, the defendants' evidence was not persuasive. The defendants correctly argue that a possible lessening of competition must be measured in a defined relevant market before a merger can be violative of Section 7. While it is true that Section 7 condemns only those mergers that may substantially lessen competition or tend toward monopoly "in any section of the country", a Section 7 violation requires that the merger lessen competition "within an area considered to be an economic significant market." A relevant market is one that takes into account not only the product (the line of commerce) but also its geographic area of distribution (the section of the country). Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); United States v. Continental Can Co., 378 U.S. 441, 84 S.Ct. 1738,

2. In United States v. Pabst Brewing Co., 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765, the Supreme Court concerned itself with an 11.32% share of a three-state market and this percentage was held to be ample to show a violation of Section 7.

12 L.Ed.2d 953 (1964); Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). We are concerned here solely with the production of beer and, therefore, the product market (line of commerce) lends itself to easy definition.[3] A geographic market must include commercial realities and at the same time be economically significant. In United States v. Pabst Brewing Co., 384 U.S. 546, 86 S. Ct. 1665, 16 L.Ed.2d 765 (1966), however, the court said:

" . . . Congress did not seem to be troubled about the exact spot competition might be lessened; it simply intended to outlaw mergers which threatened competition in any or all parts of the country. Proof of the section of the country where the anti-competitive effect exists is entirely subsidiary to the crucial question in this and every § 7 case which is whether a merger may substantially lessen competition anywhere in the United States." (At pp. 549–550, 86 S.Ct. at p. 1668)

In a horizontal merger such as that contemplated here, the geographic market may be as small as a state or as broad as the nation. United Staets v. Jos. Schlitz Brewing Co., D.C., 253 F. Supp. 129 (1966). We are not unmindful that certain characteristics of a product have some bearing in proscribing a geographic market. The one pre- dominant characteristic for beer is cost of transportation, but we find from the evidence presented in this record that a properly located brewing company enjoying successful elements of demand for its product would find little difficulty reaching an eight-state area for a market. We find that the relevant economic market affected by this proposed merger is the eight-state area, any individual state or any combination of two or more states where both defendants are obviously in direct competition.[4]

Upon the foregoing statistical proof of concentration within a relevant market area, the government argues that injunctive relief is necessary to protect the public interest and preserve the status quo. Without more, we would be in full accord; however, the defendants have gone forward with proofs and presented sufficient evidence to cast doubt upon the wisdom of granting interlocutory relief. For traditional equitable principles apply in any request for injunctive relief. And it follows that in this Section 7 case, in addition to considering the probability that a full hearing would establish a violation, the court must consider the relative injury to the parties, the industry, and the public that may or may not result from the issuance of a preliminary injunction. With this in mind, we review defendant's proof and contentions with respect to Associated's financial condition which we

---

3. The evidence presented before this court permits the finding that the term "beer" includes lager, ale, porter, stout, and malt liquor. Any given brewery producing beer is capable of producing its related by-products. The total sales of lager, ale, porter, stout, and malt liquor are not significant when compared to the total sales of beer and therefore do not materially affect the product market of concern here. There is no evidence to support the conclusion that these by-products of the beer industry or for that matter the different price levels of beer (premium or non-premium) constitute a distinct line of commerce or a sub-market. Brown Shoe Co. v. United States, supra; United States v. Jos. Schlitz Brewing Co., D.C., 253 F.Supp. 129 (1966).

4. That a state may be a relevant market is not unusual in the beer industry. Obviously, in this case where the surviving company would command upwards of 10% of a particular state market, it would indeed be unusual if an individual state were not considered a relevant economic market. The Supreme Court of the United States has already indicated that in the beer industry one state may in fact be a relevant economic market. United States v. Pabst Brewing Co., supra. See also United States v. Jos. Schlitz Brewing Co., supra.

find material when considering granting or denying a Motion for Preliminary Injunction. This we find is so because the financial condition of a corporation is material to the issue of whether the corporation is or can remain a viable competitive force in the economy.

Immediately after Associated's merger with Drewrys, on December 31, 1965, it had total assets of $54,790,827.00. On December 31, 1971, its assets had declined to $34.8 million. During this same brief period, the stockholders' equity decreased to $8.2 million. Associated's retained earnings decreased from $15.8 million to $2.4 million. This corporation's serious financial condition is easily gleaned from its steadily declining working capital. Its financial records disclose that in 1965 Associated's working capital was $14.5 million. On December 31, 1971, it was reduced to $7.2 million. Associated is bound to various long-term debt agreements with various banking institutions. These agreements contain minimum working capital requirements. In 1967, Associated fell below the minimum permitted by its loan agreement. It succeeded in obtaining an amendment to this minimum which reduced it to $9 million. The evidence discloses that on June 30, 1971, Associated had to request a waiver from its lending institutions to a temporary level of $7 million. An objective analysis of the financial statements submitted in evidence make it apparent that Associated is without prospects for maintaining the $9 million working capital requirement. In this present downward spiral, it is doubtful it can even maintain the temporarily reduced figure of $7 million in working capital. These loan agreements are still more restrictive in that they prevent payment by Associated of its subordinated debts when net income falls below the limit established in the agreement. If it is unable to obtain a waiver of this provision, Associated will

default in payment to holders of certain Series B subordinated notes.

The financial statements, together with various exhibits and testimony received in evidence, disclose that in the past several years Associated's brewing operations have suffered devastating losses.[5] Its merger with Drewrys proved to be unsound in that it substantially increased Associated's debt. In 1970, Associated lost $308,000.00 and in 1971 its brewing operation losses increased to $1.7 million. Shortly after acquiring Drewrys, Associated had to close its Detroit plant, and in 1970 it closed its Chicago plant at a loss of approximately $6 million (Pl. Exh. 26). Its working capital cannot be maintained if the downward trend in sales continues and this downward spiral will have a direct effect on its cash flow. In 1966, the western plants produced 3,444,000 barrels. This output declined to 2.2 million barrels in 1971. This record disclosed that in the past five years Associated's brewing activities have produced $3.5 million in cash flow. This level of cash flow has proven to be insufficient to properly manage corporate functions, and we find the cash flow steadily declining. The combined effect of the reduced working capital level and cash flow generated has been the necessity to sacrifice capital expenditures which have not in the past several years equaled depreciation. As a means of reducing the losses generated, Associated has sacrificed the amounts devoted to advertising. The result is that many of its plants have suffered a drastic reduction in sales.

When we consider the annual losses being suffered, together with the ever present requirement of $9 million in long-term obligations and the continual decline in sales (computed at 28% from the exhibits), it becomes clear that Associated, left on its own, will be unable

5. Whether this merger proceeds or not, Associated will still be left with a brewery not included in this agreement; namely, Piel Bros., Inc., which is an obvious drain on its resources.

to reverse its downward spiral. With these immediate prospects, we are unable to say how much longer Associated can remain afloat. For Associated to remain viable in the economic market, it will require additional financing. In such an unattractive posture, we think it next to impossible for it to obtain the financing needed. We have already indicated our concern about the decline in the number of different brewers during the last decade, but we find in this record little evidence that Associated will remain in the market. If Associated fails, we are not certain whether the effect on competition would be more detrimental than if Associated leaves the competitive field by merger.[6]

We note that an injunction in this case would likely be in effect for upwards of two or even three years, such unfortunately being the necessary interval for bringing a complicated anti-trust adjudication to final resolution. With this in mind, defendants have been able to demonstrate that Associated is in such a financially weakened condition that a preliminary injunction could, within a comparatively short period of time, remove it as a competitive economic unit. This evidence causes us to pause and to accept the proposition that granting interlocutory relief is, under these circumstances, inequitable. Moreover, in considering the evidence presented by the government, we are persuaded that appropriate interlocutory relief can be fashioned which would not prejudice the government in the event it ultimately prevails on the merits.

■ Notwithstanding our view that Associated's evidence of financial jeopardy is sufficient to delay issuance of an injunction, the defendants, nevertheless, have urged upon the court by testimony and in their briefs that Associated falls within the "failing company" exception to Section 7. This doctrine was first announced in International Shoe Co. v. F. T. C., 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431 and was accepted in United States v. Maryland and Virginia Milk Producers Assoc., 167 F.Supp. 799, aff'd 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880.[7] The burden, of course, is upon the defendants to prove the conditions precedent to application of the "failing company" doctrine have been met. In United States v. Greater Buffalo Press, 402 U.S. 549, 555–556, 91 S.Ct. 1692, 1696, 29 L.Ed.2d 170 (1971), the court stated:

> "The test is met only if two requirements are satisfied: (1) that the resources [of International] were 'so depleted and the prospect of rehabilitation so remote that it faced the grave probability of a business failure. . . .' International Shoe Co. v. F. T. C., 280 U.S. 291, 302, 50 S.Ct. 89, 93, 74 L.Ed. 431 and (2) that there was no other prospective purchaser for it. Citizens Publishing Co. v. United States, 394 U.S. 131, 138, 89 S.Ct. 927, 931–932, 22 L.Ed.2d 148."

After studying the exhibits and analyzing the creditable testimony, we find that the defendants have not carried the burden required to establish entitlement to the "failing company" exception to Section 7. Nevertheless, we do find that the evidence produced on this issue is sufficient to persuade us that injunctive relief is not warranted. One of the

---

6. The possible effect on competition if Associated's brands are lost to the market place has not been explored. Nor has the effect on share statistics and industry concentration trends should Associated fail. Raw barrelage production aside, we must recognize that various brands of beer are constantly competing with each other not only as to price and image but also as to shelf space, refrigerator position, and acceptance by wholesalers and distributors.

7. Compare views on this doctrine as stated in Erie Sand and Gravel Co. v. F.T.C., 291 F.2d 279 (C.A. 3, 1961); Crown Zellerbach Corp. v. F.T.C., 296 F.2d 800 (C.A. 9, 1961).

soundest reasons we have been able to uncover for issuance of an injunction is to preserve an economic unit in a competitive arena. If the evidence established that issuing an injunction would preserve Associated in the competitive arena, we would not hesitate to issue an injunction. But to be competitive the economic unit must be viable. Associated's degree of viability at this time is negligible. Its company's assets are not depleted to the point of insolvency, yet it is clear that its slow but inevitable financial decline may result in its loss as a viable, competitive unit without interlocutory interference by this court.

We think that more permanent and equitable relief can be granted by divestiture with appropriate controls set forth in an acceptable asset separation order.

In summary, we find, on the basis of the evidence presented on this Motion, that:

A. There is a reasonable probability that the government will succeed upon final hearing on the merits.

B. On the totality of this record, a preliminary injunctive order ought not to be issued.

C. The eight-state area, including each state therein and a combination of two or more states, is a relevant economic market contemplated by Section 7 of the Clayton Act.

D. The defendant Associated is not a "failing company" within the meaning of the Act, and therefore is not exempted from the proscriptions of Section 7.

In further proceedings to be scheduled forthwith, the burden will rest upon the defendants to present a draft of an asset separation order designed to best preserve present competitive trends and minimize pendente lite effects on competition.