CHRISTIAN SCHMIDT BREWING COMPANY and The Stroh Brewery Company, Plaintiffs,

v.

G. HEILEMAN BREWING COMPANY, INC., H–P Acquisition Corp. and Pabst Brewing Company, Defendants.

Civ. A. No. 84–5759.

United States District Court, E.D. Michigan, S.D.

Jan. 4, 1985.

William M. Saxton, Butzel, Long, Gust, Klein & Van Zile, Detroit, Mich., Joseph A. Tate, Alison Benders, Schnader, Harrison, Segal & Lewis, Mark K. Kessler, Braemer & Kessler, Philadelphia, Pa., of counsel for Christian and Robert L. Wald, Robert A. Skitol, George A. Avery, Thomas W. Brunner, Donald T. Bucklin, Wald, Harkrader & Ross, Washington, D.C., of counsel for Stroh, for Christian and Stroh.

William A. Sankbeil, Kerr, Russell & Weber, Detroit, Mich., David E. Beckwith, Foley & Lardner, Milwaukee, Wis., Howard W. Fogt, Jr., Dennis A. Henigan, Michael D. Fischer, Jonathan B. Baker, Foley & Lardner, Washington, D.C., for G. Heileman and H-P Acquisition.

Grady Avant, Jr., Long, Preston, Kinnaird & Avant, Detroit, Mich. (Sutherland, Asbill & Brennan, Washington, D.C., Michael, Best & Friedrich, Milwaukee, Wis., of counsel), for Pabst.

## MEMORANDUM OPINION

FEIKENS, Chief Judge.

Plaintiffs, Christian Schmidt Brewing Company (Schmidt) and The Stroh Brewery Company (Stroh), moved for a preliminary injunction enjoining defendant G. Heileman Brewing Company, Inc. (Heileman) from acquiring any shares of stock or exercising any control over defendant Pabst Brewing Company (Pabst). After a hearing on December 27, 1984, I granted plaintiffs' motion for a preliminary injunction. This opinion supplements that ruling.

## I. BACKGROUND

Plaintiffs and defendants in this case are brewers selling beer in the Upper Mid-west.[1] Heileman sought to acquire Pabst, and on December 6, 1984, those two brewers entered into a "Transaction Agreement" under which Heileman would make a tender offer, with the support of Pabst, for all of Pabst's outstanding shares of stock. Upon completion of the tender offer, Pabst would then be merged into Heileman. Heileman also entered a separate "Disposition Agreement" with S & P Company by which Heileman would sell certain assets (the "Western Assets") owned by Pabst to S & P. These assets include Pabst's Tumwater, Washington brewery and Pabst's Olympia, Hamms, and Olde English "800" brands. After selling the Western Assets to S & P, Heileman would retain the Pabst "family" of brands.

Stroh and Schmidt compete with Heileman and Pabst in the Upper Midwest. Plaintiffs argue that the effect of the proposed merger may be substantially to lessen competition, and therefore, Heileman's acquisition of Pabst would violate Section 7 of the Clayton Act, 15 U.S.C. § 18 (1982). Plaintiffs moved to enjoin the proposed merger pending a full trial on the merits.

## II. DISCUSSION

In exercising my discretion to grant or withhold preliminary injunctive relief, I must consider four criteria:

1) Whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits;

2) Whether the plaintiffs have shown irreparable injury;

3) Whether the issuance of a preliminary injunction would cause substantial harm to others;

4) Whether the public interest would be served by issuing a preliminary injunction.

*Mason County Medical Association v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977). I

---

**1.** The Upper Midwest consists of the following states: Illinois, Indiana, Iowa, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, Wisconsin and Wyoming. Verified Complaint ¶ 18. The appropriateness of this market for analyzing the anti-competitive effects of the proposed merger will be discussed *infra.*

find that plaintiffs have satisfied these requirements. I will discuss each in turn.

### A. *Substantial Likelihood of Success on the Merits*

■ Section 7 of the Clayton Act prohibits corporate acquisitions "where in any line of commerce ... in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18 (1982). Analysis of a Clayton Act § 7 claim begins by defining the relevant market in which it is alleged that competition may substantially decrease if two firms merge. That market consists of both a product market and a geographic market.

■ The parties agree that the relevant product market is all malt beverages ("beer"). They disagree, however, over the scope of the relevant geographic market. Plaintiffs argue that analysis of their antitrust claim should focus on the twelve-state Upper Midwest region. Defendants argue that the entire United States is the appropriate market in which to analyze any anticompetitive effects of the proposed merger. Both sides presented expert testimony in the form of affidavits and exhibits to suport their conclusions. These affidavits state complex and quite different economic theories of the brewing industry. It would be premature to make a final determination of the relevant geographic market at this stage of the proceedings. Nonetheless, I am persuaded that there is a substantial probability that plaintiffs will succeed in proving that the relevant geographic market is the twelve-state Upper Midwest region.

A merger violates Section 7 where competition may substantially decrease in any section of the country. "Congress did not seem to be troubled about the exact spot where competition might be lessened; it simply intended to outlaw mergers which threatened competition in any or all parts of the country." *United States v. Pabst Brewing Co.*, 384 U.S. 546, 549, 86 S.Ct. 1665, 1667, 16 L.Ed.2d 765 (1966). To determine a relevant geographic market, I must look to the " 'market area in which the seller operates, *and to which the purchaser can practicably turn for supplies.*' " *United States v. Philadelphia National Bank*, 374 U.S. 321, 359, 83 S.Ct. 1715, 1739, 10 L.Ed.2d 915 (1962) (emphasis in the original) (*quoting Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961)). Professor Douglas Greer, plaintiffs' economic expert, analyzed shipping costs, shipping patterns, pricing data, brand patterns, and other information, and concluded that the Upper Midwest is a relevant geographic market. (Greer Aff. ¶¶ 9–17). I find it significant, moreover, that in prior antitrust litigation in the brewing industry, courts have concluded that the Upper Midwest is a relevant geographic market. *See Pabst Brewing Co. v. G. Heileman Brewing Co.*, Bench Order at 4 (D.Del. July 21, 1982); *United States v. G. Heileman Brewing Co.*, 345 F.Supp. 117, 121 (E.D. Mich.1972) (defining an eight-state region which largely overlaps the twelve-state Upper Midwest region which plaintiffs define). While defendants' experts challenge Professor Greer's analysis and reach a different conclusion, I find that plaintiffs have sustained their burden of showing that there is a substantial probability that the Upper Midwest is a relevant geographic market.

■ In analyzing the effects on competition of the proposed merger, I begin by considering evidence of market shares and market concentration in the relevant market:

> [W]e think that a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anti-competitive effects.

*United States v. Philadelphia National Bank*, 374 U.S. at 363, 83 S.Ct. at 1741. Here, the statistical evidence overwhelm-

ingly indicates that the proposed merger would substantially lessen competition in violation of the Clayton Act. First, the proposed merger would produce a firm with an undue percentage of the market. In 1983, the Upper Midwest beer market was divided as follows: Miller—22.4%; Anheuser-Busch—21.1%; Heileman—20.4%; Stroh—14.7%; and Pabst—12.8%. (Greer Aff. exhibit 9). The remaining 8.6% of the market was divided among a number of small breweries. If Heileman were to acquire Pabst, the resulting firm would be the largest brewer in ·the region with a 30.7% market share (after Heileman disposed of the Western Assets), and would sell nearly 50% more beer than its closest competitor. By contrast, courts have prohibited mergers in the beer industry where the resulting firm would have had a much smaller market share. *See United States v. Pabst Brewing Co.*, 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966) (The Supreme Court reversed the District Court's dismissal of the case where the challenged merger made Pabst the fifth largest brewer with 4.49% of the national market, and the largest brewer in Wisconsin with a 23.95% market share.); *United States v. G. Heileman Brewing Co.*, 345 F.Supp. 117 (E.D.Mich.1972) (Although the Court did not issue the requested preliminary relief, the Court found that the Government was likely to succeed on the merits where the merger between Heileman and Associated Brewing would result in a firm with nearly 13% of an eight-state Upper Midwest market); *United States v. Jos. Schlitz Brewing Co.*, 253 F.Supp. 129 (N.D.Cal.1966)

(The Court held that Schlitz's acquisition of Labatt stock and control of General Brewing Co. violated the Clayton Act § 7 where the resulting firm would have had 23.3% of an eight-state Western market.). Moreover, I am aware of very few cases which have held that a merger did not violate the Clayton Act where the post-merger firm had 30% or more of the relevant market. In each of these cases, the relevant markets were substantially different from the market for beer.[2] Accordingly, there is a substantial probability that the proposed merger creates a firm with an undue market share.

Second, this proposed merger is further suspect due to the high concentration in the beer industry. *See United States v. Philadelphia National Bank*, 374 U.S. at 365 n. 42, 83 S.Ct. at 1742 n. 42 ("[I]f concentration is already great, the importance of preventing even slight increases in concentration and so preserving the possibility of eventual deconcentration is correspondingly great."); · *Brown Shoe Co. v. United States*, 370 U.S. 294, 315, 82 S.Ct. 1502, 1518, 8 L.Ed.2d 510 (1962) (noting Congressional concern over the "rising tide of economic concentration in the American economy."). In this case, the four largest firms control 78.6% of the market. If the proposed merger were completed, the four-firm concentration ratio would increase to 88.9%. Accordingly, a merger which increases the four-firm concentration ratio by more than ten points in an already highly concentrated industry is substantially likely to violate the Clayton Act § 7.[3]

**2.** *See, e.g., United States v. Waste Management, Inc.,* 1984 Trade Cas. (CCH) ¶¶ 66,190 (2d Cir. 1984) (The Second Circuit held that the Clayton Act was not violated where the combined firm had a 48.8% market share. The Court found, however, "that entry into the relevant product and geographic market by new firms or by existing firms ... is so easy that any anti-competitive impact of the merger before us would be eliminated more quickly by such competition than by litigation."); *United States v. Tidewater Marine Service, Inc.,* 284 F.Supp. 324 (E.D.La. 1968) (The Court held that assuming that the combined firm had a 31% market share, the merger did not violate the Clayton Act. In that case, however, the relevant market was highly

decentralized and there were "virtually no barriers whatsoever to entry." 284 F.Supp. at 339.).

**3.** The Herfindahl-Hirschman Index (HHI) is another method of measuring market concentration. The index is calculated by adding together the squares of the market shares for all firms in a market. Under the Department of Justice Merger Guidelines for 1984, an HHI between 1000 and 1800 indicates a moderately concentrated industry, and an HHI over 1800 indicates a highly concentrated industry. Moreover, a merger which would increase the HHI by more than 100 in a highly concentrated industry strongly suggests that the merger will lessen competition. In the Upper Midwest market, the

In sum, the uncontested statistical evidence concerning market shares and concentration overwhelmingly supports the inference that the proposed merger would substantially lessen competition in the twelve-state Upper Midwest region. The merger would combine the region's third and fifth largest brewers into the Upper Midwest's largest firm. The post-merger firm would have a commanding 30.7% market share. The market concentration of the brewing industry would also increase dramatically.

In evaluating this evidence, I must keep in mind the Supreme Court's instruction that a merger which produces a firm with an undue market share and significantly increases concentration in the industry "is so inherently likely to lessen competition substantially that it *must* be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anti-competitive effects." *United States v. Philadelphia National Bank*, 374 U.S. at 363, 83 S.Ct. at 1741 (emphasis added). After careful consideration of the evidence presented by defendants, I cannot conclude that the proposed merger would not have substantial anti-competitive effects.

Moreover, there are significant non-statistical factors supporting this conclusion. First, the presence of barriers to entry in the relevant market bears on whether the proposed merger would have anti-competitive effects. *See Marathon Oil Co. v. Mobil Corp.*, 669 F.2d 378, 381 (6th Cir.1981), *cert. denied*, 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982). In the beer industry, there have been virtually no new entrants for decades, and "there appears to be virtually no chance of [entry] into the

beer industry." *United States v. Pabst Brewing Co.*, 296 F.Supp. 994 at 997. *See also* Verified Complaint ¶ 15. Second, not only have there been no new entrants in the beer industry, but there is a significant trend towards concentration. In 1947, there were over 400 breweries, and that number has steadily declined to less than 35 today. This Court has previously noted "the disconcerting trend toward concentration in the brewing industry as a whole." *United States v. G. Heileman Brewing Co.*, 345 F.Supp. at 119. *See also United States v. Pabst Brewing Co.*, 384 U.S. at 550–51, 86 S.Ct. at 1668. Accordingly, I find that the statistical evidence, especially when viewed in light of the historical trends in the brewing industry, clearly indicates that the proposed merger may lessen competition substantially.

Defendants argue, however, that plaintiffs' statistical evidence overstates the anti-competitive effects of the proposed merger, and that other pertinent factors must be considered in determining whether the merger would lessen competition. Defendants primarily rely on *United States v. General Dynamics Corp.*, 415 U.S. 486, 501, 94 S.Ct. 1186, 1195, 39 L.Ed.2d 530 (1974), where the Supreme Court held that due to "fundamental changes in the structure of the market for coal, the District Court was justified in viewing the statistics relied on by the Government as insufficient to sustain its case. Evidence of past production does not, as a matter of logic, necessarily give a proper picture of a company's future ability to compete." [4]

Defendants contend that like the market for coal, the market for beer has experienced significant structural changes, and

HHI is 1746. After the proposed merger, the HHI would increase 374 to 2120. This dramatic increase in the HHI in an already concentrated market further suggests that the proposed merger would lessen competition.

4. In *General Dynamics,* the Government challenged Material Service Corporation's (and its successor, General Dynamics) acquisition of control over United Electric Coal Companies. The Court found that there were three fundamental changes in the market for coal which

undermined reliance on market shares as a predictor of future market power: 1) coal had become increasingly less able to compete with other sources of energy; 2) the electric utility industry had increasingly become the mainstay of coal consumption; and 3) since most coal was sold pursuant to long-term contracts, uncommitted reserves were a better indicator of the company's ability to compete in the future than was past market share. *General Dynamics,* 415 U.S. at 498–504, 94 S.Ct. at 1194–1197.

that the following evidence indicates that the proposed merger will not substantially lessen competition: first, both Heileman and Pabst are experiencing sales declines; second, due to the dominant market positions of Anheuser-Busch and Miller, no price increase can be sustained by any other brewer unless both industry leaders initiate a price increase; third, the merger would not make collusion within the brewing industry more likely since there is strong market differentation; and fourth, the current excess capacity in the industry (approximately one third of sales) limits a brewer's ability to increase prices.

On the record before me, it is difficult to accept defendants' assertion of a *General Dynamics* defense. First, I am not persuaded that the changes in the beer industry are as profound as defendants assert, nor profound enough to overcome the presumption of anti-competitive effects created by the overwhelming statistical evidence. In *General Dynamics*, the District Court's opinion was supported by "more than three weeks of testimony and a voluminous record," 415 U.S. at 498, 94 S.Ct. at 1194, and was issued nearly two years after trial. Here, defendants' supporting evidence was presented to this Court one day before the hearing. Within this expedited schedule, defendants did not develop enough factual support to indicate that the proposed merger would not substantially lessen competition.

 Defendants also urge that I consider the financial condition of defendants, especially Pabst, in ruling on the motion for a preliminary injunction. While it is true that I must consider this factor, *General Dynamics*, 415 U.S. at 503–04, 94 S.Ct. at 1196–97, I remain unpersuaded that the weakened condition of Pabst negates the anti-competitive effects of the proposed merger. I do not now intend to intimate how I would rule on this issue at trial; I hold only that defendants have not

yet created a sufficient record to support the assertion of a *General Dynamics* defense.

After carefully analyzing the record before me, it appears that plaintiffs have a substantial likelihood of success on the merits. The statistical evidence overwhelmingly indicates that the effect of the proposed merger may be substantially to lessen competition in the Upper Midwest. While this evidence is not conclusive on the issue of anti-competitiveness, defendants have not presented enough evidence to rebut the inference that plaintiffs have a substantial probability of success on the merits.

### B. *Whether Plaintiffs Have Shown Irreparable Injury*

 Plaintiffs have alleged that they will be irreparably harmed if the proposed merger is completed. William Elliot, President of Schmidt, testified through an affidavit that a Heileman-Pabst merger would harm Schmidt's competitive position in three ways. First, the merger would eliminate competition between Heileman and Pabst, and allow the combined firm to target its competitive efforts on other smaller brewers such as Schmidt. Second, the combined firm would be able to dominate wholesale distribution and limit access of smaller brewers to additional distributors. Third, the combined firm would be able to increase its market share at the expense of smaller brewers, eventually driving the smaller brewers out of business. (Elliot Aff. ¶ 11). Stroh similarly asserts that its distribution network would be jeopardized if Heileman and Pabst merge. (Affidavit of Peter Stroh, ¶ 9, 10). *See also* Verified Complaint, ¶ 22. Although defendants contest this evidence, I am persuaded that there is a substantial likelihood that plaintiffs' competitive position would be harmed if the proposed merger is completed.[5]

---

5. Defendants also contend that plaintiffs will not suffer *antitrust* injury, and therefore, they have no standing to assert this claim against defendants. I disagree. The harm to plaintiffs, especially Schmidt, threatened by this merger is

precisely an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d

■ Prospective relief, moreover, is a more effective remedy for an unlawful merger than is retrospective relief. *See Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 41, 97 S.Ct. 926, 949, 51 L.Ed.2d 124 (1977) ("[I]n corporate control contests the stage of preliminary injunctive relief, rather than post-contest lawsuits 'is the time when relief can best be given.'") (*quoting Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 947 (2d Cir. 1969)). If preliminary relief is not awarded and the merger is subsequently found to be unlawful, it would be extremely difficult, if at all possible, to remedy effectively the unlawful merger. *See Ronson Corp. v. Liquifin Aktiengesellschaft*, 483 F.2d 846, 851 (3d Cir.1973), *cert. denied*, 419 U.S. 870, 95 S.Ct. 129, 42 L.Ed.2d 108 (1974) ("[O]nce the tender offer becomes consummated it becomes difficult, and sometimes virtually impossible, for a court to 'unscramble the eggs.'") (*quoting Sonesta International Hotel Corp. v. Wellington Assocs.*, 483 F.2d 247, 250 (2d Cir.1973)). Accordingly, under the facts of this case, preliminary relief may be the only effective remedy for the allegedly unlawful merger.

### C. Whether Granting Preliminary Relief Would Harm Others

Defendants argue that if preliminary relief is granted, they will suffer substantial harm. Specifically, defendants contend that the issuance of a preliminary injunction effectively precludes the proposed merger, and that the defendant brewers and their shareholders will suffer irreparable injury as a result. Defendants also suggest delaying or precluding the proposed merger may threaten Pabst's financial condition.

■ While I am aware that issuance of a preliminary injunction may work some hardship on defendants, I do not believe that either defendants or their shareholders will suffer severe or irreparable harm. In an attempt to minimize any harm to the defendants, I have scheduled a trial in this case for March 28, 1985. There has been no showing that this short delay would threaten financial havoc to either of the defendants. Further, it appears that whether I grant or deny plaintiffs' motion for preliminary relief, I tip the balance of this corporate battle in favor of one party or the other. Unfortunately, it is impossible to preserve completely the status quo. Nonetheless, I am persuaded that the balance tips much less dramatically in plaintiffs' favor if I issue a preliminary injunction than it would tip in favor of defendants if I were to withhold relief. For that reason, especially in light of the strong likelihood that plaintiff will succeed on the merits, I find that the proposed merger must be enjoined.

### D. Whether the Public Interest Would be Served by Granting the Preliminary Injunction

■ I find that enjoining the proposed merger will not injure, and may well serve the public interest. Enforcing the antitrust laws of the United States clearly serves the public well. Moreover, should the merger ultimately be found to violate the Clayton

---

701 (1977). Schmidt has shown that there is a substantial probability that if the proposed merger is accomplished and competition between Pabst and Heileman is eliminated, then the combined firm would be able to target its competitive efforts on Schmidt and other small brewers. As a result of this merger, plaintiffs' ability to wholesale and distribute their products may be impaired, and ultimately, Schmidt's ability to survive in this industry of giants may be in question. This is exactly the sort of injury the antitrust laws were intended to prevent. *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610, 92 S.Ct. 1126, 1134, 31 L.Ed.2d 515 (1972) (In a Sherman Act case, the Court stated: "Antitrust laws in general ... are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms. And the freedom guaranteed each and every business, no matter how small, is the freedom to compete ...."); *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 729 F.2d 1050, 1058 (6th Cir.1984) ("*Brunswick* requires that [plaintiff's] injury results either from a lessening of competition due to the acquisitions or from 'anticompetitive acts made possible' by the acquisitions."). Accordingly, I find that plaintiffs have made the requisite showing that they are threatened with *antitrust* injury.

Act § 7, preservation of Pabst as an independent competitor in the marketplace serves the public interest. *See Marathon Oil Co. v. Mobil Corp.,* 530 F.Supp. 315, 320 (N.D.Ohio), *affd.,* 669 F.2d 378 (6th Cir.1981), *cert. denied,* 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982) ("[T]he mere possibility that Marathon would be eliminated as an effective competitor ... is sufficient to satisfy the public interest criterion."). As in the case of the defendants, an early trial will minimize whatever injury may result to the public in the event that the merger is subsequently found not to violate the Clayton Act § 7.

### III. CONCLUSION

I find that based on the overwhelming and uncontested statistical evidence, there is a strong probability that the proposed merger will substantially lessen competition in the Upper Midwest, and therefore, it violates the Clayton Act § 7. This showing can be rebutted by clear evidence that the proposed merger will not, in fact, substantially lessen competition. Defendants, however, have failed to adduce such evidence. I further find that plaintiffs would be substantially and irreparably harmed unless this merger is enjoined pending a full trial on the merits. While defendants may suffer some harm as a result of this preliminary injunction, the harm they may suffer is substantially less than the harm plaintiffs would suffer if the merger is not enjoined. Finally, I find that the public interest is best served by enjoining the proposed merger. Accordingly, I find that plaintiffs have satisfied the requirements for a preliminary injunction.

As noted above, this opinion supplements the December 27, 1984, order granting plaintiffs' motion for a preliminary injunction. A copy of that order is appended to this opinion.

### APPENDIX

Civil Action No. 84–CV–5759–DT

### ORDER GRANTING
### PRELIMINARY INJUNCTION

Upon consideration of the plaintiffs' Verified Anti-trust Complaint for Injunctive and Declaratory Relief, Motions for a Temporary Restraining Order and a Preliminary Injunction, Memorandum in Support of Plaintiffs' Motions for a Temporary Restraining Order and a Preliminary Injunction, and the supporting Affidavits of William T. Elliott, Peter W. Stroh and Douglas F. Greer, and defendants' response thereto, it is this 27th day of December, 1984, hereby

ORDERED that, pending determination of this action or until further order of this Court, defendants be preliminarily enjoined from

In the case of Heileman and H–P Acquisition Corp.—

 (i) acquiring or attempting to take any further action to acquire any shares of Pabst stock;

 (ii) voting in any manner any Pabst shares;

 (iii) exercising or seeking to exercise, directly or indirectly, any influence or control over Pabst or Pabst's management or policies; and

In the case of all defendants—

taking any steps to implement or execute the Lock-Up Option or otherwise deeming them operative or effective;

provided that plaintiffs forthwith give a bond in the sum of $100,000, for the payment of such costs and damages as may be incurred or suffered by any party who shall be found to have been wrongfully enjoined or restrained, and such bond shall be approved by the Court or by the Clerk of this Court.

/s/ John Feikens
John Feikens
United States District Court Judge

Dated: Dec. 27, 1984.