**FEDERAL TRADE COMMISSION, Plaintiff,**

v.

**The COCA–COLA COMPANY, Defendant.**

**Civ. A. No. 86–1764.**

United States District Court, District of Columbia.

July 31, 1986.

Robert B. Greenbaum, Dennis F. Johnson, Washington, D.C., for plaintiff.

Gordon B. Spivac, Thomas D. Brislin, Jonathan M. Jacobs, Douglas F. Broder, James R. Eiszner, Jr., New York City, Timothy J. Waters, Ronald A. Bloch, Washington, D.C., for defendant.

## MEMORANDUM

GESELL, District Judge.

### INTRODUCTION

By its complaint filed June 24, 1986, the Federal Trade Commission ("FTC") seeks a preliminary injunction pursuant to Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), to enjoin The Coca-Cola Company from consummating its proposed acquisition of Dr. Pepper Company, which sponsors a carbonated soft drink called Dr. Pepper, pending FTC administrative hearings [1] to determine whether the acquisition violates Section 7 of the Clayton Act, 15 U.S.C. § 18.[2] Dr. Pepper Company is being offered for sale by DP Holdings, Inc., which owns and controls all its outstanding shares.

---

1. The FTC filed a formal administrative complaint on July 15, 1986, which is marked as Court Exhibit A.

2. The acquisition has been deferred by agreement in lieu of a temporary restraining order, pending the Court's decision on this motion.

The FTC conducted an extensive investigation over several months before bringing this action. An elaborate record has been amassed consisting of numerous affidavits and documents,[3] and the Court has heard testimony of economists and businessmen in a three-day hearing. The issues have been fully briefed and argued. The Court has determined in its discretion that a preliminary injunction in the form attached should be granted based on the following findings of fact and conclusions of law.

## I. OVERVIEW

### The Applicable Standard for Review

Section 7 of the Clayton Act prohibits any acquisition of the stock or assets of a company that may substantially lessen competition or tend to create a monopoly in any line of commerce in any section of the country. The FTC has statutory authority to investigate probable violations of that Section and to seek a preliminary injunction to hold a proposed acquisition in abeyance pending administrative enforcement proceedings.

■■■ Such a statutory preliminary injunction, when sought by the FTC, may only be granted if as a factual matter the Court is satisfied that the acquisition is likely to have a substantial anticompetitive effect and the Court concludes, in the exercise of its discretion, that a proposed acquisition presents " 'questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance....' " *FTC v. Beatrice Foods Co.*, 587 F.2d 1225, 1229 (D.C.Cir.1978) (quoting FTC Brief, at 18–19). Conversely, it is important to emphasize that the Court is not asked to resolve the ultimate issues on the merits. While the Court must indicate in broad factual terms why there is ground to believe that a full hearing is appropriate to safeguard the status quo in the public interest, the Court need not resolve all disputes presented to it during the hearing nor make detailed evidentiary findings on all aspects.[4]

■■■ It is, however, clear that the proof before the Court must be sufficient to support a finding that a challenged acquisition is reasonably likely to lessen competition substantially. This assessment is a matter of probability, not speculation, and the inquiry is necessarily factual. The FTC has the burden of proof.

### The Proposed Acquisition

The Coca-Cola Company is primarily a carbonated soft drink company. It is also a major producer and distributor of motion pictures and television programs and one of the world's largest citrus marketers. Founded a century ago, it operates throughout the United States and internationally. It reported in its most recent Letter to Shareholders that "one of every two colas and one of every three soft drinks consumed by the American public is a Coca-Cola branded product."[5] It is forming by acquisition and otherwise the world's largest bottling system in aid of its marketing strategies, thus increasing its power over the principal channel of distribution. It is an aggressive, flexible, creative marketer. It has been and is a highly successful, well-managed, profitable enterprise, with 1985 revenues of approximately $7.9 billion.

Dr Pepper Company is also an old, well-established carbonated soft drink company that is principally involved in marketing its Dr Pepper brand, a soft drink which is sold

---

3. The exhibits include confidential business information garnered by the FTC during its preliminary investigation or developed during discovery. Some of these data have been submitted *in camera* and sealed pursuant to motions filed by third parties.

4. Even a hearing on the merits of a Section 7 injunction action is properly simplified "in the

interest of sound and practical judicial administration," *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 362, 83 S.Ct. 1715, 1740, 10 L.Ed.2d 915 (1963).

5. The Coca-Cola Company, Annual Report 1985, at 5.

nationally in direct competition with Coca-Cola Company brands. The Dr Pepper brand has a distinctive "spicy-cherry" or "pepper" taste and the company has developed significant sales, particularly in the South and Southwest United States. Dr Pepper Company was offered for sale through Goldman Sachs & Co., an investment banking firm, which caused Coca-Cola Company to initiate discussions leading to an agreement to buy the entire stock for $470,000,000.

Coca-Cola Company was motivated by a variety of somewhat divergent considerations in agreeing to acquire Dr Pepper Company. As a strictly business matter, the acquisition would be profitable for Coca-Cola Company's shareholders. Essentially, Coca-Cola Company is buying the company for its trademark and existing market. It would give the Dr Pepper brand new life by absorbing it into its multiproduct line of carbonated soft drinks. Dr Pepper's debts would be paid off, expenses would be greatly reduced, and Coca-Cola Company's marketing skills, research ability, resources and position in the overall market would assure greater sales of the Dr Pepper brand at wider per-unit profit margins.

Another special factor played a role in the bid for Dr Pepper Company. Coca-Cola Company had been expanding without acquisition, but when PepsiCo, Inc., its principal competitor, sought to make a major acquisition of Seven-Up Company, Coca-Cola Company apparently felt it should have the same privilege, if the rules permitted. The Seven-Up acquisition was abandoned domestically under threat of FTC suit but Coca-Cola Company decided to press on.[6]

The acquisition will for all practical purposes eliminate Dr Pepper as an independent company. Many of its employees will be terminated as their functions are merged into Coca-Cola Company. Concentrate manufacturing will be transferred to Puerto Rico. No independent corporate structures of any consequence will remain. Dr Pepper Company, if it retains a separate identity, will become essentially a shell—its principal product merely another flavor in Coca-Cola Company's expanding product line. Indeed, these economies are essential to the profitability of the acquisition for Coca-Cola Company. Thus the possibility that Dr Pepper Company could be held separate pending FTC review, to allow for effective divestiture in the event of a decision against the acquisition, is not a practical consideration. There has been no suggestion that the company would remain a viable competitor at the conclusion of FTC's long, drawn-out process.

**The Position of the Parties**

FTC challenges Coca-Cola Company's acquisition of Dr Pepper Company on two major grounds. It claims that Dr Pepper is a carbonated soft drink concern competing both nationally and regionally directly with Coca-Cola Company's products, particularly its cherry Coke and Mr. PiBB brands, and that such competition will be eliminated. It further contends that the acquisition will increase concentration in the market and encourage tacit price collusion and other parallel policies of mutual advantage between Coca-Cola Company and PepsiCo, the other major seller in the carbonated soft drink business, thus encouraging if not resulting in a lessening of competition.

Coca-Cola Company, while admitting that the carbonated soft drink market is concentrated,[7] contends that any threat to competition posed by concentration will not significantly change if Dr Pepper is acquired. It says it is locked in an all-out competitive rivalry with PepsiCo which has been and will remain so intense that the possibility of collusion simply does not exist. Any

---

6. If the acquisition agreement is not consummated by August 29, 1986, either party may terminate. Counsel for Coca-Cola Company indicated at oral argument that the transaction will likely be abandoned if it is preliminarily enjoined. *See* Tr. at 583–85.

7. As will be noted, however, Coca-Cola Company insists that the relevant product market is much broader, encompassing a number of other beverages.

relaxation of the existing competition, it suggests, would, moreover, simply fortify the existing smaller competitors and encourage entry by larger concerns now exploring entry on a full scale. Since it believes entry is otherwise relatively easy, Coca-Cola Company argues that competition will continue should the vigor of the struggle between the two principal companies diminish. Thus it suggests the acquisition of Dr Pepper is basically irrelevant in considering the objectives of Section 7. Moreover, Coca-Cola Company contends that, if anything, the acquisition will actually promote competition by making the Dr Pepper brand a more effective competitor in the market nationwide.

## II. THE LINE OF COMMERCE INVOLVED

### The Market is Carbonated Soft Drinks

Both Coca-Cola Company and Dr Pepper Company manufacture and sell soft drink concentrate and syrup as their primary business. In order to appraise the probable effects of the proposed acquisition, it is necessary at the outset to understand the forces at work in the market where the buyers and sellers of concentrate and syrup principally compete.

■ Proper market analysis directs attention to the nature of the products that the acquirer and the acquired company principally sell, the channels of distribution they primarily use, the outlets they employ to distribute their products to the ultimate consumer, and the geographic areas they mutually serve. Factors affecting price and interchangeability of products must be considered. Analysis of the market is a matter of business reality—a matter of how the market is perceived by those who strive for profit in it.[8] Moreover, under Section 7 market forces must be analyzed

as they operate in "any section of the country"—any geographic submarket possessing its own economically significant attributes.[9]

■ The Court is persuaded that the appropriate "line of commerce" for measuring the probable effects of this acquisition is the carbonated soft drink market and that such effects must be appraised both nationally and, as will be noted, in a seven-state area in the South and Southwest United States.

Carbonated soft drinks are produced by adding carbonated water to a syrup consisting of a "concentrate" flavoring and a sweetener. The carbonated soft drink market is guided primarily by "concentrate companies" like Coca-Cola Company and Dr Pepper Company that develop, test, market and promote a variety of concentrate flavorings to appeal to the consumer. Concentrate is normally purchased by "bottlers" alone or in syrup form; the bottlers then mix the flavoring with carbonated water and package the mixture in bottles and cans. Bottlers normally are also largely responsible for distributing the final product directly to retailers through a variety of channels to consumers. Food stores and similar retail outlets are the primary channel, accounting for approximately 63 percent of carbonated soft drink retail sales. "Fountain" distribution of carbonated soft drinks in restaurants and other outlets for immediate consumption is responsible for about 25 percent of sales, while sales through vending machines account for about 12 percent.

Concentrate companies are faced with keen competition for the limited shelf space in stores and for placement among the few products featured in the typical fountain or vending machine. Bottlers are key partici-

8.  See, e.g., *United States v. Continental Can Co.,* 378 U.S. 441, 449–58, 84 S.Ct. 1738, 1743–47, 12 L.Ed.2d 953 (1964); *United States v. Aluminum Co. of America,* 377 U.S. 271, 275–77, 84 S.Ct. 1283, 1286–87, 12 L.Ed.2d 314 (1964); *Brown Shoe Co. v. United States,* 370 U.S. 294, 324–28, 82 S.Ct. 1502, 1523–25, 8 L.Ed.2d 510 (1962).

9.  See, e.g., *United States v. Pabst Brewing Co.,* 384 U.S. 546, 548–50, 86 S.Ct. 1665, 1667–68, 16 L.Ed.2d 765 (1966); *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 357–62, 83 S.Ct. 1715, 1738–40, 10 L.Ed.2d 915 (1963); *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962).

pants in this competition. Concentrate companies normally grant bottlers exclusive franchises to produce and distribute the company's products, to stores and vending accounts, within a defined territory. In return for these perpetual franchises, bottlers are obliged to use their best efforts to promote the company's product line, and are typically barred from dealing in same-flavored products of other concentrate companies. Although most bottlers are not owned by the concentrate companies, the companies provide substantial marketing assistance, research data and a variety of short- and long-term promotional benefits.

In view of the structure and operation of this industry, the relevant line of commerce in evaluating the acquisition is assuredly not what Coca-Cola Company suggests— "all ... beverages including tap water"— even though it is true that other beverages quench thirst and that "[t]he human stomach can consume only a finite amount of liquid in any given period of time." [10] The market or submarkets delineated need not be this broad (anything potable) nor as unduly narrow (concentrate flavoring) as lawyers or economists may choose to suggest.

Although other beverages could be viewed as within the "outer boundaries of a product market ... determined by the reasonable interchangeability of use or the cross-elasticity of demand between [carbonated soft drinks] and substitutes" for them, carbonated soft drinks represent at minimum a well-defined and the major beverage submarket sufficient to "constitute [a] product market[ ] for antitrust purposes." [11] The Court is guided here by *Brown Shoe Co. v. United States*, from which this quotation is adopted, where the

Supreme Court counsels reliance on "such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct consumers, distinct prices, sensitivity to price changes, and specialized vendors" as guides for defining the appropriate market. [12]

Such indicia are present here. Carbonated soft drinks are the leading beverage in the United States, accounting for approximately 22.3 percent of per capita beverage consumption. They are among the most heavily promoted and widely distributed consumer products in existence, and generate significant revenues; wholesale carbonated soft drink sales totaled $23.5 billion in 1984. Moreover, the major participants in the market do a nationwide business and specialize mainly in carbonated soft drinks. They make pricing and marketing decisions based primarily on comparisons with rival carbonated soft drink products, with little if any concern about possible competition from other beverages such as milk, coffee, beer or fruit juice. [13]

The national carbonated soft drink market, and segments of it, are thus the proper market within which to measure the probable effects of the acquisition at issue.

### The Market Is Highly Concentrated

There is general agreement that the market for carbonated soft drinks is already highly concentrated. It consists of a few major concentrate companies and a number of minor concerns, not all of which do business nationally. The major concerns, their 1985 national market shares and their principal soft drink products are approximately as follows: [14]

**10.** Memorandum of The Coca-Cola Company in Support of the Proposed Acquisition, May 28, 1986, at 83 (attached as Appendix C to Affidavit of William J. Lynk, Defendant's Exhibit (DX) 18).

**11.** *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962).

**12.** *Id.*

**13.** *See, e.g.,* True Knowles (Vice-President, Dr Pepper Company), Plaintiff's Exhibit (PX) 7, at 47; William P. Casey (Executive Vice-President, Coca-Cola Company), PX–8, at 45–47.

**14.** The market statistics are taken from those published by A.C. Nielsen, a widely used source of data in the industry based on local surveys of food store sales. PX–104. The data understate Dr Pepper's true market share because they do not reflect sales in the fountain channel, where

| Company | Co./Cumulative | Principal Products |
|---|---|---|
| 1. Coca-Cola Company | 37.4 / 37.4 | Coca-Cola Classic, Coke, diet Coke, cherry Coke, Tab, Sprite, Minute Maid orange and lemon-lime flavors, Fanta flavors, Mellow Yellow, Fresca and Mr. PiBB |
| 2. PepsiCo, Inc. | 28.9 / 66.3 | Pepsi-Cola, Diet Pepsi, Mountain Dew and Slice lemon-lime, apple and cherry flavors |
| 3. Philip Morris | 5.7 / 72.0 | 7-Up, Diet 7-Up, Like Cola |
| 4. Dr Pepper Company | 4.6 / 76.6 | Dr Pepper, Diet Dr Pepper |
| 5. R.J. Reynolds | 3.0 / 79.6 | Sunkist Orange Soda, Canada Dry flavor line |
| 6. Royal Crown | 2.9 / 82.5 | RC Cola, Diet RC, Diet Rite, assorted other flavors |
| 7. Proctor & Gamble | 1.3 / 83.8 | Orange and other Crush flavors, Hires Root Beer |

As the above table illustrates, there are only a few companies presently of any competitive significance. Coca-Cola Company and PepsiCo dominate. They blanket a vast spectrum of flavors, offering a variety of cola and noncola drinks. Their multiple product lines add greatly to their marketing power and flexibility, allowing them to provide retailers with the advantage of a full range of products through one company, and to economize on promotions by spreading costs over a greater volume of sales.

This obvious concentration has both factual and legal significance. Factually, as will appear from the discussion that follows, the position of the dominant concerns is enhanced by their control over the major channels of distribution and is protected by the severe obstacles confronting any concern seeking to challenge this status. Legally, the already commanding position that Coca-Cola Company holds in this concentrated market raises an almost absolute prohibition to further enhancement of that position by acquisition.

### Distribution Channels are Controlled by Dominant Concerns

As noted previously, effective channels of distribution to the ultimate consumer are essential to competitive success in the carbonated soft drink industry. To ensure effective distribution, the major concentrate companies grant exclusive territorial marketing rights to their bottlers, provide substantial marketing assistance and promotional funds, and generally prohibit their bottlers from distributing competing flavors of other companies.[15] This strategy strengthens the ability of the dominant firms to move their product lines to the store shelves, vending machines and fountain outlets by leveraging a variety of products together through one committed seller directly to retailers. Also, through this arrangement, new products offered to meet the development of competing flavors or

the brand is relatively stronger. Recently Cadbury-Schweppes (with a market share of about 0.5%) agreed to acquire the R.J. Reynolds operations, for approximately $230 million. The listing of principal products omits some diet and caffeine-free variants of leading brands.

15. These restrictions, enforced by sanctions for product transshipping, prevent intrabrand competition. They were insulated from federal antitrust scrutiny by the Soft Drink Interbrand Competition Act, see 15 U.S.C. § 3501 et seq.

The restrictions prohibit only distribution. Bottlers remain free to package for companies that distribute through alternative channels.

The restrictions usually do not apply to fountain sales; thousands of fountain warehouses are free to deal in all brands. However, the fountain channel apparently does not provide an effective avenue for new entry, as existing fountain accounts generally carry only proven brands.

Coca-Cola Company does not formally restrict its bottlers' ability to distribute competing noncola flavors, though as a practical marketing matter, these bottlers sometimes have substantial reasons to carry only Coca-Cola Company brands.

brands can be given strong support by providing them to retailers in a package deal along with already dominant brands. This "piggybacking" capacity is well recognized in the trade as a considerable advantage, making competition against companies capable of executing the strategy all the more difficult.

Given the importance of effective distribution, concentrate companies naturally seek to market their products through bottlers with the greatest resources and strongest local market share.[16] In the carbonated soft drink industry, a bottler generally cannot be an effective distribution and marketing force in a local market unless it has a market share of at least 15 to 20 percent of total distribution. There is considerable indication that absent such a presence in the market, the bottler will be unable to command sufficient sales volume to convince retailers to carry its promotional activities rather than those of the dominant companies.[17]

As Dr Pepper Company's experience demonstrates, the strongest and preferred bottlers are those primarily affiliated with Coca-Cola Company and PepsiCo. Of its approximately 450 bottlers, 208 carry Coca-Cola Company products as their main brand line; they distribute 39 percent of Dr Pepper volume. Another 166 bottlers, with 31 percent of Dr Pepper sales, are affiliated with PepsiCo. The remaining 30 percent of Dr Pepper volume is distributed by about 75 "independent" bottlers that do not bottle for the dominant companies. Typically, the independents are affiliated with Seven-Up Company or Royal Crown or both, along with other smaller brands.

It is the combination of several popular brands that enables these independent bottlers to compete against the dominant companies by moving enough volume to serve as effective distributors. For this reason they are often referred to as the "third bottler" within a given territory; rarely do the smaller brands have enough volume to support a fourth bottler of effective size in a local market. The Dr Pepper business of these independents strengthens their ability to offer a line of products that can collectively compete for retail space and that can "piggyback" new entrants into the retail outlets.

Dr Pepper Company, however, is in an enviable position because it enjoys access to the bottlers of the dominant companies. Other companies seeking to seriously challenge the dominance of Coca-Cola Company and PepsiCo by entering in the major flavor segments would probably have serious difficulty finding effective distribution.[18] To equal Dr Pepper's distribution success, they would have to convince the affiliated bottlers to abandon their currently successful flavors for a new brand with no track record. Moreover, even if the new brand promises to be successful, affiliated bottlers have strong incentives to carry the dominant company's brand to reap the substantial marketing advantages conferred by a full line of highly promoted flavors, and to maintain a good relationship with their main supplier.[19]

16. *See, e.g.,* Donald Lee Antle (Dr Pepper Company), Exhibit 5 of Affidavit of James R. Eiszner, Jr., DX–10, at 23, 29; James F. Orr (Vice-President of Sales, Crush Int'l, Inc.), Tr. at 53–59.

17. *See, e.g.,* Affidavit of William Sutton (Vice-President/Treasurer, Seven-Up Bottling of Topeka, Inc.), PX–96, at 1, 4; Testimony of David M. Haffner (Vice-President, Seven-Up Company), PX–12, at 77–78, 85–87; James C. Epley (Director of Franchise Relations and Development, Seven-Up Company), PX–13, at 66–69.

18. Of course, it is conceivable that an entrant could challenge existing companies with a successful new flavor not barred by existing restrictions. In all likelihood, however, such an entrant would face severe challenge from the dominant companies' present practice of expanding their flavor lines to fill new "niches." Dr Pepper has survived this challenge largely because it enjoyed several decades as the sole occupant of its niche, enabling it to build up a substantial consumer franchise.

19. For example, Seven-Up Company was able to secure bottling for its Like Cola (introduced in 1982) in only half the country at the height of the brand's popularity because bottlers, including many affiliated with the company, refused to drop their established cola flavors.

Thus, potential entrants would be forced to look elsewhere for their distribution needs. But as Dr Pepper Company's bottling distribution illustrates, relatively few independent bottlers have the strength to compete on a major scale. Moreover, the strong independent bottlers are unlikely to be available for major entry due to their own flavor restrictions. They typically carry Seven-Up in the lemon-lime category; RC Cola or a regional cola; and Crush or Sunkist in the orange segment. And, any available bottlers could accommodate only one new entrant in each flavor segment.

Alternative channels of distribution are unproven and of dubious effectiveness. Warehousing of products with delivery to stores by food brokers may be unsatisfactory in providing adequate shelf space and opportunities for effective promotion; moreover, this distribution channel does not allow for delivery to vending and fountain outlets. No major company currently uses it. Reliance on beer distributors is probably inadequate for similar reasons.

As a further concern, effective access to bottlers is likely to become even more difficult in the future as dominant companies increasingly focus their energies on controlling their distribution network even more tightly. Coca-Cola Company, for example, has long moved toward this goal by acquiring its bottlers, often subsequently selling them to stronger and more congenial management. Earlier this year, it announced a new effort to "strengthen further [its] U.S. distribution system and accelerate volume growth" by consolidating its present bottling operations with those of its largest bottling franchise, JTL Corporation, to form "the world's largest independent bottling operation." This decision was part of its "strategy to achieve a stronger, more efficient bottler network by investing more aggressively in bottler operations through minority interests and joint ventures, when appropriate." [20] Coca-Cola Company ultimately acquired JTL Corporation, for approximately $1.4 billion, as well as the bottling operations of Beatrice Cos. for about $1.1 billion.

Apart from making effective entry at the distribution level generally more difficult, Coca-Cola Company's bottling strategy suggests an additional threat to competition should this acquisition be consummated. Post-acquisition, a substantial portion of Coca-Cola Company's Dr Pepper sales would be bottled by independent bottlers. This situation would conflict with its firm and long-standing practice of selling all its products in a given territory through a single bottler. To the extent Coca-Cola Company chooses to vigorously promote independent bottlers' sales of the Dr Pepper brand, it will be placed in the position of directly competing in marketing against its own bottlers. Obviously, such a bifurcated arrangement could create tension and prevent the achievement of the efficiencies and marketing advantages of distributing a full line of products through a single channel that in part make the acquisition profitable.

Given these difficulties, it is likely that Coca-Cola Company would gradually shift Dr Pepper bottling either to existing Coca-Cola Company bottlers or to its own bottling concern, as part of its usual practice of transferring ownership of bottling franchises to ensure efficient distribution. Of course, the company has assured the independent bottlers that it will not unfairly seek to terminate their franchises. Indeed, it has every reason, if it is to expand sales of the Dr Pepper brand, to promote good relations with Dr Pepper bottlers at least temporarily. But with the substantial incentives involved, it is more than likely that Dr Pepper bottling will gradually find its way into the Coca-Cola Company system one way or another.

Although Dr Pepper franchises are perpetual, they have been frequently sold (since 1981, more than one-third of them have changed hands); and such sale requires the approval of the concentrate company. Apart from its control of such transfers, Coca-Cola Company could also offer

20. The Coca-Cola Company, Annual Report 1985, at 13.

to directly buy the Dr Pepper franchises for itself. Given the marketing advantages it would achieve from doing so, it would likely be able to pay a premium price for them. Although the precise effects of the acquisition on distribution cannot presently be sketched, such change of ownership would further weaken independents in their competitive struggle and make entry into the market more difficult. It therefore merits further review by the FTC.

**Other Barriers to Entry are Significant**

The lack of adequate distribution channels enhances the market power of the dominant companies. Other difficulties facing companies seeking to enter the carbonated soft drink market on a substantial scale also tend to leave that power unchallenged. These barriers to entry include the substantial time and expense required to build a brand name that may overcome existing consumer preferences; the large sums needed for frequent promotions to secure the brand a place in retail outlets already dominated by companies with a full line of flavors; and the inability promptly to recoup the substantial investments involved. Thus, regardless of the ease of entering solely at the concentrate company level, what cannot be doubted from the record is that entry on a scale sufficient to challenge the major companies is exceedingly difficult, requiring enormous sums of money and years of effort.

To establish a major new brand requires large expenditures for advertising to fix the brand name and image in the mind of the consumer—expenditures that cannot be recovered if the introduction fails. Decades of advertising and promotion by the major concerns have built up an enormous consumer franchise for their products. Indeed, as Coca-Cola Company management has testified, the company is paying $470 million for Dr Pepper Company not for any facilities it may have, but for the existing appeal of its trademark and distinctive flavor among consumers. In an attempt to establish its new Like Cola brand, Philip Morris, a major consumer marketer and owner of Seven-Up Company, spent $57

million in the first two years of distribution and planned to spend over $260 million in the following eight years, though it has since concluded that the brand has failed.

Effective entrants must also match the considerable promotional budgets of the dominant companies in targeting their brands for effective distribution through retailers; Coca-Cola Company spent almost $200 million last year in this marketing area alone. Moreover, the diverse, ever-expanding line of flavors carried by the dominant companies and favored by retailers makes it difficult to gain promotion for single products, thus raising the investment stakes for entrants hoping to compete with the dominant companies on an equal footing.

Finally, it has been the experience of the industry that effective entry against the dominant companies is likely to require years of sustained effort for any continuing success, thus making the prospects of profitable investment in new brands remote. For example, Proctor & Gamble, an enormously successful consumer products company that entered the market in 1980 through acquisition of Crush International, Inc., with its Crush and Hires Root Beer brand lines, has been able to expand sales only marginally, despite a strong management commitment to the business and the expenditure of millions of dollars. Philip Morris has had no success to date in expanding the sales of Seven-Up Company, and has recently suffered from PepsiCo's introduction of its Slice lemon-lime flavor. The inability of companies with such marketing skill and financial resources to succeed in direct competition with Coca-Cola Company and PepsiCo indicates clearly the difficulties of entry and suggests concentration in this market will persist. The dominant concerns appear to retain great leeway to develop in ways that are antithetical to entry.

### III. AN OVERVIEW OF THE ACQUISITION'S EFFECTS

The record contains much speculation as to the effects the obvious increase in con-

**1138**

centration caused by the proposed acquisition may have upon market performance. FTC presents as its major concern the possibility that the dominant competitors may choose to relax competition and enjoy larger, more uncontested profits. No tendency in that direction has yet been evidenced and there is no proof that the mere addition of Dr Pepper to Coca-Cola Company's line, standing alone, will trigger a foreseeable development of this kind. The present intensity of competition between Coca-Cola Company and PepsiCo does not seem likely to diminish in the immediate future. But the fact remains that if the proposed acquisition is consummated there will be one less independent factor in the market to challenge the dominance of Coca-Cola Company.

At the preliminary injunction hearing economists, drawing on experience in this multi-faceted discipline, flatly disagreed as to the significance of the proposed acquisition upon competition in the market. These sincere professionals are theoreticians in an imprecise field. They have never sold a can of carbonated soft drink and indeed the principal economist for Coca-Cola Company frankly admitted he had little knowledge of the underlying facts.

█ The Court should not, in any event, rely on the economic testimony in reaching a conclusion about the probable effects of the proposed acquisition given the concentrated nature of the market just outlined. Section 7 of the Clayton Act was not designed to support a particular economic theory; it was directed at what Congress in the exercise of its own common sense perceived. Congress desired to outlaw substantial increases in concentration through acquisition by a dominant concern in an already concentrated industry by placing a heavy burden of proof upon anyone seeking to justify growth by purchase under such circumstances. Section 7 was founded on a "fear of what was considered to be a rising tide of economic concentration in the American economy." *Brown Shoe Co. v. United States*, 370 U.S. 294, 315, 82 S.Ct. 1502, 1518, 8 L.Ed.2d 510 (1962). This compelling concern, the Supreme Court has "observed many times," led Congress to design Section 7 as "a prophylactic measure, intended 'primarily to arrest apprehended consequences of intercorporate relationships before those relationships could work their evil....' " [21]

█ Given this dominant legislative desire to curb the economic concentration of power, it is unnecessary to speculate about the economic effect of the proposed acquisition. Without more, substantial mergers of this kind in heavily concentrated industries are presumed illegal. In such cases, as the Supreme Court made clear in *United States v. Philadelphia National Bank*, 374 U.S. 321, 363, 83 S.Ct. 1715, 1741, 10 L.Ed.2d 915 (1963), "elaborate proof of market structure, market behavior, or probable anticompetitive effects" can even be dispensed with. Instead, a court must be guided by the view that "a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *Id.*

The Supreme Court has made clear that once the government has established a prima facie case of a Section 7 violation based on a significant increase in market concentration, as the FTC has done here, it is "incumbent upon [the acquiring company] to show that the market-share statistics give an inaccurate account of the acquisitions' probable effects on competition." *United States v. Citizens & Southern National Bank*, 422 U.S. 86, 120, 95 S.Ct. 2099, 2118, 45 L.Ed.2d 41 (1975). Thus, in *Philadelphia National Bank*, the Court

---

**21.** *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 485, 97 S.Ct. 690, 695, 50 L.Ed.2d 701 (1977) (quoting *United States v. E.I. du Pont de Nemours & Co.,* 353 U.S. 586, 597, 77 S.Ct. 872, 879, 1 L.Ed.2d 1057 (1957) ).

enjoined a bank merger which would have given the defendant bank a market share of at least 30 percent, increasing the market share of the two largest banks by more than one-third, from 44 percent to 59 percent. In doing so the Court rejected the argument that the merger was acceptable because it would not alter the underlying dynamics of the already highly concentrated market, stating that "if concentration is already great, the importance of preventing even slight increases in concentration and so preserving the possibility of eventual de-concentration is correspondingly great." *Id.* 374 U.S. at 365 n. 42, 83 S.Ct. at 1742 n. 42.

The same rationale applies to the questioned acquisition. Post-acquisition, Coca-Cola Company would enjoy a 42 percent share of the carbonated soft drink market, certainly an "undue percentage share" of the market; the 4.6 percent addition to market share represents a "significant increase" in concentration particularly in light of its substantial elimination of direct competition, as will later be outlined.

█ Use of bare market statistics alone to invalidate this particular acquisition, quite apart from evidence of the control of distribution channels and other barriers to entry already shown, is presumptively justified. Evidence suggesting otherwise must be clear and specific.

█ Such evidence is not present in this case. This is not a situation where a small company is acquiring another small company to enhance its competitive power, nor a case where a larger new entrant seeks a firmer foothold in the market by acquisition, nor a case where Coca-Cola Company needs Dr Pepper's trademark to fulfill its contractual obligations. Nor is Dr Pepper a failing company. The stark, unvarnished truth is that the Dr Pepper brand has been a staunch effective competitor in the market, that Coca-Cola Company has tried to stifle it by developing its own pepper drink [22] and by seeking to replace it with its new cherry Coke brand in fountain accounts at considerable expense [23] and that it has failed. It is now seeking to buy out its competitor. Once the Dr Pepper brand joins the Coca-Cola Company line, much of this direct rivalry will probably cease.[24] The acquisition totally lacks any apparent redeeming feature.[25]

The immediate effect of the proposed acquisition is clear. It will mute, if not wholly eliminate the competition between Coca-Cola Company's carbonated soft drink products and those of Dr Pepper Company.

22. See, e.g., "Mr. PiBB Strategy" (Coca-Cola Company Document, 1982), PX–19, at 187; "Mr PiBB Brand Review" (Coca-Cola Company Document, undated), PX–67 at 124.

23. See, e.g., Lawrence R. Cowart (Sen. Exec. Vice-President, Coca-Cola Company), PX–9, at 94 (recounting attempts to convince fountain customers to replace Dr Pepper with cherry Coke). Dr Pepper, concerned in general about cherry Coke, retaliated with additional marketing and advertising dollars, see Robert Hamlin (Vice-President, Dr Pepper Company), PX–10, at 65–66. Coca-Cola Company specifically targeted all convenience store fountain sales in an attempt to dislodge Dr Pepper, see PX–74. It offered $320,000 for Circle K's termination of Dr Pepper in its 2,700 stores, see PX–78. Dr Pepper subsequently convinced some of these stores to keep its brand by spending $74,350, see PX–79.

24. After announcement of the acquisition, the top management of Dr Pepper stated, in reference to the cherry Coke threat, that "[w]e must reach some arrangement with Coca-Cola that neither one of us continue to throw money away attempting to preclude one or the other from the business or spend excessive money to maintain our position in the business. This is only a waste of both of our resources." "Communications," PX–64, at page three.

25. Coca-Cola Company suggests one: that the acquisition would be good for consumers because Dr Pepper would become a more successful and widely available product. But this argument proves too much. The inherent ability of a dominant company in a heavily concentrated industry to expand sales after eliminating a competitor from the market and acquiring its products cannot justify a presumptively illegal acquisition. *Cf. United States v. Pabst Brewing Co.*, 384 U.S. 546, 554, 86 S.Ct. 1665, 1670, 16 L.Ed.2d 765 (1966) (Douglas, J., concurring). Wider sales of a soft drink achieved by eliminating competition is not a benefit which Section 7 affords to dominant concerns.

This substantial lessening of competition will be particularly significant in portions of the South and Southwest United States where the Dr Pepper brand was first marketed and where it continues to serve as a major obstacle to Coca-Cola Company's presence. Here, Coca-Cola Company management has recognized Dr Pepper Company as "one of [its] principal competitors," with "a share of market that is very strong." [26] Dr Pepper's market share is especially significant to competitive conditions in seven contiguous states: Texas, Louisiana, Mississippi, Alabama, Georgia, Tennessee and Arkansas. Congress, in enacting Section 7, found the elimination of direct competition and the resulting heightening of concentration to be equally reprehensible, whether occurring on a national or regional level. This seven-state area comprises a relevant "section of the country" for analysis under Section 7.

In this region, if Coca-Cola Company is allowed to acquire Dr Pepper, it will have a market share in excess of 50 percent in 32 significant population areas. The following table lists these areas along with the post-acquisition market share that Coca-Cola Company would enjoy (with its share increase in parentheses), PepsiCo's share, and the pre- and post-acquisition two-firm concentration ratios: [27]

| Nielsen Market | Coke Post-Acq. Share | | Pepsi Share | Pre-Acq. 2 Firm Conc. | Post-Acq. 2 Firm Conc. |
|---|---|---|---|---|---|
| Chattanooga, TN | 75.2 | (+3.9) | 8.4 | 79.7 | 83.6 |
| McAllen, TX | 74.6 | (+7.1) | 10.2 | 77.7 | 84.8 |
| Pine Bluff, AR | 71.7 | (+10.9) | 11.8 | 72.6 | 83.5 |
| Little Rock Branches, AR | 68.6 | (+11.3) | 16.6 | 73.9 | 85.2 |
| Monroe, LA | 68.3 | (+10.1) | 8.2 | 68.3 | 76.5 |
| Cuero, TX | 66.4 | (+9.7) | 14.4 | 71.1 | 80.8 |
| Jackson, MS | 66.1 | (+5.6) | 13.4 | 73.9 | 79.5 |
| Rome, GA | 65.8 | (+4.7) | 15.7 | 76.8 | 81.5 |
| Amarillo, TX | 64.5 | (+16.4) | 17.1 | 65.2 | 81.6 |
| Baton Rouge, LA | 64.1 | (+7.6) | 12.9 | 69.4 | 77.0 |
| Houston, TX | 64.0 | (+8.3) | 17.7 | 73.4 | 81.7 |
| Dothan, AL | 62.3 | (+6.2) | 16.7 | 72.8 | 79.0 |
| Austin, TX | 60.9 | (+12.0) | 20.0 | 68.9 | 80.9 |
| Brownsville, TX | 60.5 | (+7.5) | 17.4 | 70.4 | 77.9 |
| Fort Worth, TX | 60.3 | (+22.2) | 18.9 | 60.3 | 79.2 |
| Memphis, TN | 60.1 | (+4.2) | 17.8 | 73.7 | 77.9 |
| Corpus Christi, TX | 59.0 | (+9.8) | 18.8 | 68.0 | 77.8 |
| Little Rock Core, AR | 58.2 | (+6.6) | 16.6 | 68.2 | 74.8 |
| Dallas, TX | 57.7 | (+17.6) | 19.1 | 59.2 | 76.8 |
| Mobile, AL | 57.4 | (+3.4) | 17.2 | 71.2 | 74.6 |
| Montgomery, AL | 56.0 | (+5.1) | 17.3 | 68.2 | 73.3 |
| Columbus, GA | 55.5 | (+7.4) | 14.2 | 66.7 | 74.1 |
| El Paso, TX | 54.8 | (+4.7) | 19.4 | 69.5 | 74.2 |
| Augusta, GA | 54.3 | (+1.2) | 27.6 | 80.7 | 81.9 |
| New Orleans, LA | 54.1 | (+4.7) | 16.6 | 66.0 | 70.7 |
| Nashville, TN | 52.5 | (+4.5) | 18.7 | 66.7 | 71.2 |
| Atlanta, GA | 52.1 | (+3.3) | 19.2 | 68.0 | 71.3 |
| AL/MS Subtab | 51.8 | (+4.8) | 24.2 | 71.2 | 76.0 |
| San Antonio, TX | 51.7 | (+7.3) | 14.4 | 58.8 | 66.1 |
| Temple, TX | 51.7 | (+10.5) | 25.0 | 66.2 | 76.7 |
| Pensacola, FL | 51.5 | (+2.6) | 28.7 | 77.6 | 80.2 |
| Louisiana Coke | 50.9 | (+4.3) | 19.5 | 66.1 | 70.4 |

26. William P. Casey, *supra* note 13, at 42. *See also* Lawrence R. Cowart, *supra* note 23, at 94.

27. These statistics are based on A.C. Nielsen local market areas and cover the period 12/1/84 to 11/30/85. They are compiled and at some points simplified from Tables 9, 11, 15 and 17 of Appendix B to the Affidavit of Lawrence J. White, PX–104.

Coca-Cola Company's suggestion that this destruction of competition will not occur and in any event is not substantial is patently without merit.

CONCLUSION

The long-range implications of this proposed acquisition should not be ignored. Coca-Cola Company and PepsiCo have battled long and hard without buying up competitors. It is clear from the history of this case that Coca-Cola Company's decision to acquire Dr Pepper Company was prompted partly by PepsiCo's initial resort to acquisition. Coca-Cola Company's able counsel argues that it is merely a demonstration of the free market in operation when the largest concern in a line of business buys up a smaller one by offering the most money. But it is something far more. Investment bankers cannot expect to exact the highest price for a company they have corralled if a sale is anticompetitive. There are others who can pay a fair price for Dr Pepper and at the same time build with it into a stronger position to battle the two giants who presently dominate this significant and concentrated market.

If, instead, acquisition by the leading carbonated soft drink corporations becomes the order of events, as it certainly will should either major company succeed, then down the line there will be diminishing possibility of other rivals emerging to freshen and invigorate the competition. It is just this process that Congress sought to check by bringing under sharp scrutiny any incipient move in this direction by any dominant concern functioning with the force of Coca-Cola Company in a highly concentrated market—a market of major consequence to consumers.

Any federal judge considering regulatory aims such as those laid down by Congress in Section 7 of the Clayton Act should hesitate before grafting onto the Act an untried economic theory such as the wealth-maximization and efficiency-through-acquisition doctrine expounded by Coca-Cola Company. Congress never made such a choice nor has the FTC, a specialized agency to which Congress entrusted part of the Section 7 enforcement task. Surely Congress had a variety of considerations in mind when it enacted the major public policy enunciated by this Section. There were concerns about size as such, about opportunity for small business, about concentration trends; there was also a belief that a diversified competitive market assures a healthy economy and encourages innovation. To be sure, efficiencies that benefit consumers were recognized as desirable but they were to be developed by dominant concerns using their brains, not their money by buying out troubling competitors. The Court has no authority to move in a direction neither the Congress nor the Supreme Court has accepted.

A preliminary injunction in the form attached shall issue forthwith.